**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

FERNANDO BELMONTES, Jr.,
            *Petitioner-Appellant,*

v.

JILL L. BROWN, Warden, for the
California State Prison at San
Quentin,*

            *Respondent-Appellee.*

No. 01-99018

D.C. No.
CV-89-00736-DFL

OPINION

On Remand from the United States Supreme Court

Filed July 15, 2005

Before: Stephen Reinhardt, Diarmuid F. O'Scannlain, and
Richard A. Paez, Circuit Judges.

Opinion by Judge Reinhardt;
Partial Concurrence and Partial Dissent by
Judge O'Scannlain

---

*Jill L. Brown is substituted for her predecessor, Jeanne S. Woodford, as Warden of California State Prison at San Quentin. *See* Fed. R. App. P. 43(c)(2).

**COUNSEL**

Eric S. Multhaup, Mill Valley, California; Christopher H. Wing, Sacramento, California, for the petitioner-appellant.

Mark A. Johnson, Deputy Attorney General, Sacramento, California, for the respondent-appellee.

**OPINION**

REINHARDT, Circuit Judge:

## I. PREAMBLE

On July 15, 2003, we filed an opinion in this case holding that there is a reasonable probability that as a result of instructional error the jury did not consider constitutionally mitigating evidence at the penalty phase. We remanded to the district court for the issuance of a writ of habeas corpus vacating the death sentence. *Belmontes v. Woodford*, 350 F.3d 861 (9th Cir. 2003). The warden timely petitioned the Supreme Court for a writ of certiorari. On March 28, 2005, the Supreme Court granted the writ, vacated our judgment, and remanded the case "for further consideration in light of *Brown v. Payton*, 544 U.S. ___, 125 S.Ct. 1432, ___ L.Ed.2d ___ (2005)." *Brown v. Belmontes*, 125 S.Ct. 1697 (2005) (mem.).

Upon careful consideration, we conclude that *Payton* does not affect our holding in the present case. Notwithstanding the similarity of the factual and legal issues, *Payton* was a post-AEDPA case and was decided under the highly deferential AEDPA standard, while the case before us is pre-AEDPA and is determined by the application of the ordinary rules of constitutional interpretation. Under AEDPA, if a state court reasonably determines the facts and correctly identifies the governing federal standard, a federal court can grant a writ of

habeas corpus only if the state court was objectively unreasonable in its application of clearly-established Supreme Court law. Such is not the case when AEDPA does not apply. In such circumstance, we simply resolve the legal issue on the merits, under the ordinary rules. Because we recognize "that AEDPA wrought substantial changes in habeas law," *Williams v. Taylor*, 529 U.S. 362, 387 n.14 (2000) (plurality opinion), we must be careful not to confuse AEDPA's deferential standard of review with the pre-AEDPA standard we employ in this and in other pre-AEDPA cases. As *Williams* points out, if anything about AEDPA is clear, it is that "an unreasonable application of federal law is different from an incorrect application of federal law." *Id.* at 365. The issue here is not the AEDPA issue that the Court confronted in *Payton,* but whether the state court engaged in an "incorrect" application of federal law.

In *Payton*, the Supreme Court held that the state court was not objectively unreasonable in concluding that the use of California's factor (k) did not unconstitutionally prevent the jury from considering relevant postcrime mitigating evidence. *Payton* did *not* hold, however, that the use of the challenged factor was itself constitutional or unconstitutional, either as a matter of fact or law. Unlike in *Payton*, here we are required to determine that very question and our determination must be made by applying the ordinary pre-AEDPA rules.

In concluding in our earlier opinion that California's factor (k), coupled with the trial judge's instructions, resulted in a reasonable probability that the jury did not consider Belmontes' principal mitigating evidence, we reached an independent legal judgment as to the constitutionality of the challenged instruction. In doing so, we were free to, indeed required to, determine the constitutional question on its merits. Having carefully reviewed *Payton*, and our previous independent determination of the constitutional question at issue,

we find no reason to change our judgment on the matter. We reaffirm our previous opinion, and reiterate it below.[1]

## II. INTRODUCTION

In this pre-AEDPA death penalty case, Petitioner Fernando Belmontes, Jr., appeals the district court's denial of his petition for writ of habeas corpus. Because the jury was not instructed that it must consider Belmontes' principal mitigation evidence, which tended to show that he would adapt well to prison and would likely become a constructive member of society if incarcerated for life without possibility of parole, and because there is a reasonable probability that the instructional error affected the jury's decision to impose the death penalty on Belmontes, we grant the petition with respect to the penalty phase. We reject, however, those claims that seek

---

[1]Of the eight Justices who participated in the consideration of *Payton*, four specifically reached the same legal conclusion that we reach here: California's factor (k) may cause a jury to fail to consider constitutionally relevant postcrime mitigating evidence. In addition to the three dissenting Justices in *Payton* — Justices Stevens, Souter, and Ginsberg — who would have found the use of California's factor (k) unconstitutional even under the heightened deferential AEDPA standards, Justice Breyer, who joined the majority opinion, specially concurred to note that had he been making an independent determination of the constitutional issue on the merits, he likely would have held the "Payton's penalty-phase proceedings violated the Eighth Amendment," which "[i]n a death penalty case . . . requires sentencing juries to consider all mitigating evidence." *Payton*, 125 S.Ct. at 1442 (Breyer, J., concurring). Two of the other four Justices in the majority held only that it was not objectively unreasonable for the state court to have concluded that the jurors most likely believed that the evidence in mitigation was permitted by California's factor (k) and that they considered that evidence in their deliberation, but those Justices, O'Connor and Kennedy, expressed no view as to how they would have decided the constitutional question had they not been required to apply AEDPA's highly restrictive standard. *See Payton*, 125 S.Ct. at 1442. Only two Justices, Scalia and Thomas, stated that regardless of whether they applied the pre- or post-AEDPA rules, they would have held that limiting a jury's discretion to consider mitigating evidence does not constitute a constitutional violation. *See id.* (Scalia, J., concurring).

relief from the judgment of conviction and the finding of special circumstances. Accordingly, we affirm the district court's decision in part, reverse in part, and remand with instructions to issue a writ vacating the death sentence.

## III. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Crime, Its Investigation, and Pretrial Proceedings

On the morning of Sunday, March 15, 1981, 19-year-old Steacy McConnell telephoned her parents and stated that she was afraid because several people, including codefendant Domingo Vasquez, had threatened her. Several hours later, McConnell's parents arrived at her residence in Victor, California, and found her lying unconscious in a pool of blood. She died shortly thereafter from cerebral hemorrhaging caused by fifteen to twenty blows to her head with an iron bar. Her skull was cracked, and she had defensive injuries on her hands, arms, and feet. The house was ransacked and her stereo was missing.

On the Tuesday preceding the murder, several people, including Vasquez and another codefendant, Robert "Bobby" Bolanos, partied at McConnell's house. Although Bolanos left the residence early Wednesday morning, the party continued until Friday, when Vasquez stole a quantity of "black beauties"— amphetamine pills — from McConnell. Upon discovering the theft, McConnell threw Vasquez and his friends out of the house. The group subsequently discussed their dislike of McConnell.

Police investigation of the individuals who had been present at the party extended to Vasquez, and ultimately to Bolanos, who drove a distinctive black Chevy. The police recognized Bolanos' car as matching the description of the car that had been seen in McConnell's driveway at the time of the murder. The police impounded the car and interrogated Bolanos. Bolanos eventually admitted that he had been

involved in the events that led to McConnell's death; he identified Vasquez and Petitioner Fernando Belmontes, Jr., who had not been at the party but who had been visiting him over the weekend of the murder, as his coadventurers. On the strength of Bolanos' statement, the police obtained a warrant and headed South to Ontario, where they arrested Belmontes at his brother's home. Belmontes was nineteen at the time.

Belmontes, Bolanos, and Vasquez were each charged with first degree murder and special circumstances. However, Bolanos soon arranged a deal with the prosecution in which he agreed to testify against Vasquez and Belmontes in exchange for a guilty plea to second degree burglary and immunity on the murder charge. At Vasquez's preliminary hearing, Bolanos fingered Belmontes as the main assailant. After the preliminary hearing, the trial judge dismissed the special circumstances charge against Vasquez, and he pled guilty to second degree murder. That left Belmontes, who alone proceeded to trial.

## B. The Guilt Phase

Bolanos was the principal witness for the state. He testified that on the morning of Sunday, March 15, he and Belmontes drove to Vasquez's residence to hang out. When they arrived, Vasquez was on the phone with McConnell. When Vasquez hung up the phone, he informed them that McConnell would not be home during the latter part of the day. The three were short of cash, and they agreed to burglarize McConnell's residence, steal her stereo, and "clean house." Vasquez's wife, Karrie Lynn, testified that as the men departed through the kitchen, Belmontes grabbed from the counter an iron dumbbell bar, which she used for rolling tortillas.

Bolanos told the jury that the three men drove to McConnell's house in Bolanos' vintage, black car and parked a short distance from the house. According to Bolanos, Belmontes stated that he would approach the house alone, on foot, carry-

ing the metal bar in case he needed to force entry, so that he could gather McConnell's valuables and place them near the door to facilitate a quick getaway, and that the other two should wait for about five minutes and then bring the car around to McConnell's house.

Bolanos testified that the events unfolded as follows: Belmontes left his wristwatch with him, concealed the bar under his jacket, and walked to McConell's residence. Bolanos and Vasquez waited about five minutes, then drove up and backed into McConnell's driveway. Vasquez tried to open the trunk but could not find the right key. Bolanos got out of the vehicle to assist Vasquez. He heard repeated knocking or banging noises coming from within the house. Bolanos unlocked the trunk and got back inside the car, while Vasquez walked to the front door to assist Belmontes. Shortly thereafter, Belmontes and Vasquez emerged from the back door of the house carrying stereo components. Belmontes was sprinkled with blood on his face, pants, and shoes. Vasquez "looked like he had seen a ghost." Belmontes stated that he had had to "take out a witness" because she was home. He explained that when McConnell heard Vasquez and Bolanos drive up, she looked away from him and he seized the opportunity to hit her with the bar approximately fifteen times.

Lucy Flores, McConnell's neighbor, testified that on the morning of the murder she watched Bolanos' Chevy as it backed into McConnell's driveway. She observed a man get out of the passenger side and try to unlock the trunk. He appeared to be having difficulty, whereupon the driver got out of the car and unlocked it. The driver got back in the car, while the passenger walked towards the front of McConnell's house and met a third man. She did not see where the third man had come from. The two men headed toward the front of McConnell's house. A short while later, she saw them exit McConnell's house from the back door, carrying stereo equipment, which they loaded in the trunk before getting in the car and driving away.

Bolanos testified that, after leaving McConnell's house, the three drove to the nearby city of Galt, where they intended to fence the stereo. En route, Belmontes wiped blood from the metal bar and his shoes. Belmontes threw the bar out of the window as they crossed a bridge over the Mokelumne River.[2] They went to the home of Manuel Vasquez, Domingo's brother, where Belmontes changed his pants. The three contacted Raul Barron, who met them at the home of Irma Vasquez, Domingo's sister, and purchased McConnell's stereo components from them. Barron later testified that he paid $100 for the stereo to a man wearing a baseball cap (Belmontes), who did most of the talking.

Teresa Cobarrubio, Bolanos' girlfriend, testified that Bolanos gave her fifteen dollars from the proceeds of the sale of the stereo. Acting scared, he informed her that he, Belmontes, and Vasquez had burglarized McConnell's residence. The following day, Bolanos and Cobarrubio read a newspaper account of McConnell's murder, and Bolanos related further details of the crime. He told Cobarrubio that he had remained in the car, and that Belmontes had exited the house with blood on his clothes and had stated that he "had to take a witness out."

Bolanos testified that on Monday, March 16, Vasquez called him to advise that he had been questioned by police and did not want to "take the rap" for the murder. Bolanos and Belmontes went to Vasquez's house, where the three conferred. Karrie Lynn Vasquez testified that from the kitchen she overheard Belmontes say that he entered McConnell's house alone and hit her multiple times with the bar before Vasquez joined him in the house.

Barbara Murillo, Belmontes' girlfriend, testified that after the meeting, Belmontes telephoned her and told her that he

---

[2] Bolanos later led police to the location on the river bank from which the bar was recovered.

was "in trouble." He reported that he had gotten into an argument with McConnell at her house, become angry and hit her, and that she fell and "went to sleep," although he "didn't mean for her to go to sleep."

Detective Holman, the lead investigator, testified that Belmontes furnished three tape-recorded statements shortly after his arrest. In the first statement, he denied any involvement in the crime. In the second, he admitted the burglary but denied hitting McConnell. In the third statement, he admitted hitting McConnell, but insisted that he only hit her once, and then only at Vasquez's direction. He stated that the single blow he delivered caused McConnell to fall down, whereupon he dropped the bar and began searching the house for valuables, leaving Vasquez alone with McConnell. Belmontes contended that he did not pay attention to Vasquez's actions during this period and did not observe how McConnell came to have suffered fifteen to twenty fatal blows to her head. Holman also testified that a small drop of blood found on the tongue of one of Belmontes' shoes tested as "type O"—McConnell's blood type.

Dr. Maduros, the pathologist who performed the autopsy on McConnell, testified that she died from cerebral hemorrhaging caused by fifteen to twenty blows to the back left portion of her skull. She had a separate contusion on her right temple, which was caused by a single blow of lesser force that did not lacerate the skin. However, this blow alone would not have caused death and, if it had been the first, it would not likely have caused unconsciousness. Injuries to McConnell's arms, hands, legs, and feet evidenced a struggle. According to Dr. Maduros, there would have been sounds "like a cracked pot" associated with the blows that fractured McConnell's skull, and blood would have splattered in a manner consistent with the blood patterns found on the door jambs in her house.

Belmontes testified in his own defense. He insisted that Vasquez dealt the fatal blows while he, Belmontes, searched

the back part of the house for something to take. Belmontes recounted that he and Bolanos had gone over to Vasquez's house, and that when Vasquez mentioned that McConnell would not be home, they decided to steal her stereo. Although they expected McConnell to be away, the plan was that Belmontes would go to the door in case she turned out to be home; because of the unhappy denouement of her party a few days earlier, McConnell would become angry and suspicious if she saw Vasquez or Bolanos at her door. Although Belmontes had met McConnell a few times in the past, she did not know that he was a friend of Vasquez and Bolanos.

Belmontes' version of events was consistent with Bolanos' up to the point of who struck the blows that killed McConnell. Belmontes agreed that Vasquez and Bolanos stayed in the car while he walked to McConnell's front door. He stated that Vasquez had given him the metal bar to use to break a window; but that he concealed it in his sleeve. According to Belmontes, he knocked at McConell's door and, to his surprise, she answered. As soon as he found out that she was home, he abandoned his intent to burglarize her residence. He told her that he was hitchhiking and had stopped by because it was raining. McConnell invited him in. She noticed a bulge in his sleeve and asked what it was. He showed her the bar and explained that he had it because he was hitchhiking. He used McConnell's bathroom and then stood by the table and talked to her while she ironed clothes. McConnell told him that she was having problems with some people and asked him if he knew Domingo Vasquez. Belmontes said that he had met him.

Belmontes' testimony continued: Five minutes after he entered the house, Bolanos and Vasquez pulled into the driveway. McConnell started walking toward the front door. Belmontes followed behind her and was placing the bar back up his sleeve when Vasquez rapped on the door. Under Belmontes version, when Bolanos' car backed into the driveway, Vasquez would have had to proceed immediately to the front

door; he would not have had time to go to the trunk of the car to attempt to open it.

According to Belmontes, after he knocked at the door to McConnell's house, Vasquez pushed it open, saw McConnell, and ordered Belmontes to "hit her." Belmontes followed Vasquez' directive and, using a backhanded sweeping motion, struck McConnell on the side of her head with the bar. She fell to the floor. Belmontes dropped the bar, ran to the back bedroom, broke down the door, searched that room and the kitchen, and returned to the living room. He did not enter the master bedroom. Upon returning to the front of the house, he observed Vasquez standing over McConnell and holding the metal bar. He did not see Vasquez hit McConnell or hear any blows landing because he was not paying attention. He could not explain the presence of defensive bruises and contusions on McConnell's hands, arms, and feet.

The rest of Belmontes' testimony is, with one significant exception, consistent with Bolanos': Belmontes and Vasquez gathered the stereo components and exited from McConnell's back door. They loaded the stereo components into the trunk. Vasquez got in the back seat, Belmontes rode shotgun, and Bolanos drove. According to Belmontes, while en route, Vasquez handed him the steel bar, which had flesh and hair residue on it, and then Vasquez (not Belmontes) stated that he had had to take out a witness. Belmontes, still wearing his gloves, wiped blood off the bar and set it down on the floorboard. He was uncertain whether there was blood on his pants when he left McConnell's house; he said that the blood might have come off the bar when he placed it on the floorboard. He denied having wiped any blood off of his shoes and asserted that Bolanos and Vasquez told him to throw the bar out his window into the river, and that he complied.

Belmontes concluded his testimony by stating that the three drove to Manuel Vasquez' house, where he changed into a pair of Manuel's pants. Manuel contacted Raul Barron, whom

they then met at Irma Vasquez' house. Barron bought the stereo for $100. Bolanos, Vasquez and Belmontes divided the money, bought some beer, and drove to the home of an acquaintance to purchase narcotics.

Belmontes' girlfriend, Barbara Murillo, testified that six months after the murder, she ran into Cobarrubio at the Grape Festival. Murillo believed that Belmontes was the murderer. However, when she asked Cobarrubio for further details about the crime, Cobarrubio claimed that Belmontes had been "set up" because he had no backup in the area, whereas Vasquez had a network of local friends.[3]

After three hours of deliberation, the jury convicted Belmontes of first degree murder with special circumstances. It also made special findings that Belmontes was the actual killer and that he had the specific intent that death occur.

## C.   The Penalty Phase

At the penalty phase, the prosecution introduced minimal aggravating evidence. Detective Holman authenticated two autopsy photographs depicting McConnell's wounds. William Cartwright, manager of a motel in Ontario, California, testified to an incident in early 1979 in which an individual named Rudy met Belmontes at a motel and attempted to sell him a .32 caliber automatic handgun that he had acquired in a burglary. Belmontes reportedly examined the loaded weapon, cocked the trigger, pointed it at Rudy and stated, "I've got it now. Why buy it?" Rudy left the premises and Belmontes retained the weapon.

---

[3]Cobarrubio testified that she recalled running into Murillo at the Grape Festival. Murillo had asked her whether she thought Belmontes "might have been set up." Cobarrubio replied: "Well, he might have." Cobarrubio testified further that in fact she had no information from any source that Belmontes had been set up but answered as she did because she felt sorry for Murillo.

Steven Cartwright testified that he had a conversation with Belmontes in February 1979 in which Belmontes alluded to the fact that some people were upset with him. As Belmontes talked, he indicated that he had a gun in his belt by slapping his side, and he stated that he was not concerned because he had all the protection he needed. Ron Cutler, a California Youth Authority ("CYA") counselor, testified that he once observed Belmontes swinging a chair as if he were about to hit another ward, but Cutler was able to intervene before a fight ensued. On cross examination, he admitted that Belmontes was significantly smaller than the other youth.

Barbara Murillo testified about a domestic violence incident that occurred when she asked Belmontes to move out of their shared apartment and to give her his keys so he could not come back. During the fight that ensued, Murillo, who was four months pregnant with Belmontes' second child, grabbed a "file" for protection and attempted to phone the police, but Belmontes cut the telephone cord with his knife. Belmontes pushed her and hit her on the head, at one point causing her to drop their infant daughter. He tried to choke her, but they were separated by friends who were present. Murillo fled through a window, but Belmontes dragged her back to the vicinity of the apartment. A neighbor eventually summoned the police, who arrived as Belmontes was leaving the premises.

Finally, the prosecution and defense stipulated that Belmontes entered a plea of no contest in April 1979 to a charge of being an accessory after the fact to voluntary manslaughter. The court refused to allow the prosecutor to introduce evidence that Belmontes had actually murdered the victim, Jerry Howard.[4] Consequently, the jury never heard any details of the murder or Belmontes' alleged role in it.

---

[4]The prosecutor's proffer included testimony from an eyewitness who saw Belmontes shoot Howard, a CYA counselor to whom Belmontes had confessed that he did so, another individual who saw Howard get into a car with Belmontes on the evening he was killed, and the police officer who found the murder weapon at Belmontes' house.

Belmontes' mitigation presentation was also limited in scope, focusing on two themes: his family and personal history and his capacity for rehabilitation and positive institutional adjustment. It was primarily the latter theme that defense counsel pressed upon the jury.

Belmontes' family history was one of poverty and violence. His maternal grandfather, Michael Salvaggio, testified to his daughter's unhappy marriage to Belmontes' father. Salvaggio recounted that his daughter was sixteen when she ran away from home and married Belmontes' father, who was unemployed, refused to support his family, drank to excess, and beat her. Salvaggio said that he was "very close" to his grandson until Belmontes was about thirteen but after that had little contact with him. However, Salvaggio continued, when Belmontes was sixteen and his grandmother lay dying in the hospital, he visited her every day; he also attended her funeral.

Carol Belmontes confirmed that her marriage to Belmontes' father was unhappy. Fernando Belmontes, Sr., was a violent alcoholic who "wouldn't ever work," and who beat her, breaking her arm on one occasion and stabbing her on another. Belmontes was ten years old when the marriage broke up. Mrs. Belmontes remarried. That marriage broke up five years later, when Belmontes was about fifteen, after which he became difficult to control. Belmontes had not lived with his mother since he was committed to the CYA two years before McConnell's murder. He had a younger brother and sister, to whom he was "very close."

Belmontes again testified on his own behalf. He recounted that he had a poor relationship with his father, who often came home drunk and hit his mother. He did not like school and stopped attending in the ninth grade. He wanted to get a job so that he could help his mother pay the bills. Although he described his youth as "pretty hard," he twice stressed that he did not want to "use it as a crutch."

Robert Martinez, a close friend of Belmontes' since their early teens, testified that he and Belmontes spent a great deal of time together, usually working on Martinez's low-rider car. Belmontes served as best man at Martinez's wedding and was someone he could turn to for advice and support when he argued with his wife. Martinez also testified that he felt Belmontes was not a violent person. However, with defense counsel's consent, this testimony was struck following an objection from the prosecutor, who argued that if this evidence was admitted, the prosecution should be allowed to impeach Martinez with the evidence regarding the Jerry Howard murder.

More important by far was the second mitigation theme—that Belmontes could lead a positive, constructive life if confined within an institutional setting. The state agrees that Belmontes' counsel, John Schick, presented "substantial evidence" in support of this theme in the form of a series of witnesses who testified to Belmontes' behavior and achievements during his prior CYA incarceration and to the likelihood that he would make positive contributions to the welfare of others if his life was spared. Belmontes himself testified that he was in the custody of the Youth Authority from early 1979 until November 1980, four months prior to the crime. While at the CYA, he was employed on the fire crew at the Pine Grove Camp for one year, during which he worked his way up from last man to number two, a position of leadership and responsibility. Belmontes also testified that during his incarceration he became involved in the M-2 Christian sponsorship program. He admitted that he initially entered the M-2 program as a way to get out of camp, but he explained that he was touched by the decency of his M-2 family, the Haros, and so gradually became curious about Christianity and embraced it.

Belmontes continued by saying that he was paroled from the Youth Authority after serving his maximum sentence; that he stayed at the halfway house in Oakland for two weeks and

then went to Southern California for a short period, returning with Murillo to the Lodi area to take a job with the forest service; and that he subsequently moved to Lodi in part so that he could be close to the Haros. However, outside of the institution, Belmontes said, he had trouble maintaining his religious commitment and "started going back to [his] old ways," in part due to "pressure on the streets." At the time of trial, he had not abandoned his religious beliefs but felt that he was no longer "dedicated one hundred percent" to his religious commitment. He testified that he would hope to make positive contributions to society if he were ordered incarcerated, though he had little specific idea of how he might do so.

The Reverend Dale Barrett, chaplain at the Youth Authority's Pine Grove Facility, testified that he knew Belmontes from his participation in the M-2 Christian sponsorship program, which matched a local church-going family with a ward, who would be permitted to leave the facility to visit with the family at specified times each week. Barrett explained that Belmontes was matched with Beverly and Fred Haro and participated in the program for about a year. In addition, Belmontes was baptized during his stay in the CYA. Only a small percentage of program participants who made a serious commitment to Christianity were baptized. Barrett felt that, unlike the many wards who stayed in the program only to get out of camp and manipulate favors from the sponsoring families, Belmontes had not "conned" them. Barrett testified that although he personally believed in the death penalty, he did not think Belmontes deserved to die because he was a "salvageable" person with "a lot of extenuating circumstances in his life." Barrett was of the view that Belmontes' involvement in the McConnell murder was attributable to "the enormity of the peer pressure and the kind of sociological circumstances that were part of his life," and he thought that if Belmontes were granted a life sentence, he would make positive contributions to prison life through his involvement with the prison ministries.

Don Miller, assistant chaplain at the Youth Authority's Preston Facility and the Northern California Director of the M-2 program, testified that he helped place Belmontes in a halfway house in Oakland upon his release from the CYA. Miller stated that, at the time, he felt "a little bit doubtful" about Belmontes' ability to lead a productive life outside of a highly structured environment, like prison. Miller testified that Belmontes stayed at the halfway house for only two weeks before moving to the Lodi area to take a job with the forest service. During those two weeks, however, Belmontes returned to Preston on a few occasions to speak to wards about what life was like "on the outside." Miller described Belmontes (and his message) as well-received by the CYA wards, and he believed that if Belmontes were committed to prison for a life term, he would be good at counseling other prisoners not to make the same mistakes that he had. Miller was enthusiastic about working with Belmontes in this capacity and stated that Belmontes "definitely would be used in the prison system for this kind of activity" because he related well to other prisoners, especially those who shared his ethnic background, and because these kinds of programs were "at the present time the only solution" to the troubling problem of recidivism among prisoners.

Finally, several witnesses offered evidence with respect to Belmontes' conversion to Christianity, which occurred during his first CYA incarceration, and his failure to maintain his religious commitment upon his release. Martinez's wife Darlene, a born-again Christian, testified that she had known Belmontes for six or seven years and considered him a close friend. Darlene recounted that when Belmontes visited them after his release from the Youth Authority, he told her that he was a born-again Christian. He also mentioned his disputatious relationship with his girlfriend, Murillo, and mentioned that he was planning to move in with her. During the conversation, Belmontes expressed concern that Murillo was not a Christian, and he worried that he would be unable to maintain his Christian faith on his own.

Beverly and Fred Haro, Belmontes' M-2 sponsors and members of Reverend Barrett's church, testified that Belmontes spent Wednesday evenings and weekends with them for almost a year. They felt they had a good relationship with Belmontes, who attended church with them. They treated him like their own son, and he opened up to them and was a good influence on their own teenage son. They saw him several times after his release from the CYA. Fred Haro stated that he had "compassion as a son" for Belmontes and that Belmontes had been genuine in his commitment to the M-2 program and his affection for his sponsors. Beverly Haro felt that Barbara Murillo was a "definite negative factor" in Belmontes' life.

At the conclusion of the evidentiary stage, the court permitted Belmontes to address the jury personally during closing arguments. Belmontes stated that he did not think that his difficult childhood excused his role in the McConnell murder. However, he explained that he could not handle the pressures of life outside of an institution, and he asked the jury to give him "an opportunity to achieve goals and try to better [him]self." Belmontes' attorney similarly stressed that Belmontes could not "make it on the outside." He argued that Belmontes had had a hard life but still retained his humanity. He characterized Belmontes as someone who thrived in a structured environment—as evidenced by his accomplishments while in the CYA—and asked the jury to spare Belmontes' life on the ground that he would make positive contributions if allowed to live out his natural life in prison.

The judge instructed the jury according to the then-standard model jury instructions, which directed the jury to consider as mitigating evidence the defendant's age, criminal history, and "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." In addition, the judge read a portion of a supplemental instruction requested by the defense, which stated that the jury should view the statutory factors "merely as examples of some of the factors" that it could consider, that the jury

"should pay careful attention to each of these factors," and that "any one of them standing alone" could support a life sentence. The trial judge refused to read the most important part of the requested instruction, which stated: " "[Y]ou should not limit your consideration of mitigating circumstances to these specific factors. You may also consider any other circumstances . . . as reasons for not imposing the death sentence." The jury was not informed that it should consider mitigating evidence bearing on Belmontes' probable future conduct if sentenced to life in prison without the possibility of parole. Shortly after Belmontes' trial, the California legislature revised the model jury instructions to make clear that the jury must consider any aspect of the defendant's character or record offered as a basis for a sentence less than death, "whether or not related to the offense for which he is on trial." CALJIC 8.85(k) (6th ed. 1996).

The jury deliberated for a day and a half before reaching a verdict. On the first day, after several hours of deliberations, the jury sent the judge a note asking, "What happens if we cannot reach a verdict?" and "Can the majority rule on life imprisonment?" The jury was brought back to the courtroom, and the judge reread a portion of the jury instructions, emphasizing that "all 12 jurors must agree, if you can." The trial judge refused to tell the jurors what would happen if they could not agree.

The trial judge emphasized that if the jurors "[went] over the instructions again with one another," they might find it easier to reach agreement. The jurors then asked the judge to clarify the instructions on the weighing of the aggravating and mitigating factors. One juror asked the trial judge whether the jury was supposed to take each listed (i.e., statutory) factor, decide whether it was aggravating or mitigating, and then "balance the sheet." Rather than instruct the jurors that it was their duty to consider and, if appropriate, give effect to, all of the mitigating evidence presented by the defendant, whether comprehended by one of the statutory factors or not, the trial

judge responded simply, "That is right," even though no statutory factor comprehended the element of rehabilitation. Shortly thereafter, another juror asked whether it was possible for Belmontes to receive psychiatric treatment while in prison. The trial judge responded, "That is something you cannot consider in making your decision." Following this colloquy, the jury returned a death sentence.

## D. Post-Trial

The California Supreme Court affirmed Belmontes' conviction and sentence in 1988, *People v. Belmontes*, 45 Cal. 3d 744 (1988), and the U.S. Supreme Court denied certiorari in early 1989. Belmontes then filed a petition for writ of habeas corpus in the United States District Court for the Eastern District of California, which was held in abeyance while Belmontes exhausted state remedies.

Belmontes filed a state habeas petition and received a stay of execution from the California Supreme Court. The California courts summarily dismissed Belmontes' petition, refusing him compulsory process and denying him an evidentiary hearing on any of his claims. The California Supreme Court finally denied relief in 1992.

In 1993, proceedings on the federal writ commenced before a magistrate judge. In 1996, he denied Belmontes' request for an evidentiary hearing on certain claims but granted his motion to expand the record to include depositions, declarations, and reports submitted by the parties. The parties filed cross motions for summary judgment. In 2000, the district court withdrew the referral from the magistrate judge and, in August of that year, denied relief on all claims except six that had not yet been briefed. The court referred those six claims to the magistrate judge for a recommendation. In January 2001, the magistrate judge recommended denying the outstanding claims, and in May 2001, the district court adopted the magistrate's findings and recommendations, denied the

petition, and entered judgment against Belmontes. The district court issued a Certificate of Appealability for fifteen constitutional claims. This appeal timely followed.

## IV.   STANDARD OF REVIEW

Because Belmontes filed his habeas petition prior to AEDPA's effective date, we apply pre-AEDPA standards of review. *Woodford v. Garceau*, 123 S. Ct. 1398, 1401 (2003). State court factual findings are presumed correct unless one of eight enumerated exceptions applies. *See* 28 U.S.C. § 2254(d) (1994). The application of law to historical facts is reviewed *de novo*. *Thompson v. Borg*, 74 F.3d 1571, 1573 (9th Cir. 1996).

## V.   GUILT PHASE ISSUES

### A.   Giglio *and* Napue *Claims*

Belmontes alleges that the state deprived him of due process by failing to disclose that Bolanos had several misdemeanor charges and that the prosecutor personally helped him achieve favorable dispositions on those charges. In a closely related claim, he contends that the prosecutor violated due process by failing to correct Bolanos' false and misleading testimony that he had never been "busted" before his arrest for the McConnell murder.

### 1.   Factual Background

On the Wednesday morning before the murder, Bolanos drove into a traffic signal on his way home from McConnell's house. A police officer witnessed the accident. After flunking a field sobriety test, Bolanos was taken into custody and charged with various misdemeanor driving offenses, including DUI and hit-and-run.

One week later, Bolanos was charged with first degree murder for his role in the McConnell murder. He soon entered

into an agreement in which he pled guilty to second-degree burglary in exchange for testifying against Vasquez and Belmontes. He was granted immunity for his testimony and his sentence was left to the court's discretion. He received no explicit promises of leniency from the prosecution.

After Bolanos pled guilty to the burglary, he obtained a string of unusually favorable dispositions on several traffic offenses. First, with respect to the DUI/hit-and-run charges, his attorney appeared in municipal court along with Clark Sueyres, the district attorney who was prosecuting the case against Belmontes. On Sueyres' motion, the charges were dismissed in the interest of justice. Next, later that year, Bolanos was cited for driving an unregistered vehicle and driving with a suspended license. He was allowed to plead guilty to the lesser charge of driving without a valid license and assessed a $100 fine; the court dismissed the unregistered vehicle charge. The following April, Bolanos was again cited for driving an unregistered vehicle, driving with a suspended license, operating an unsafe vehicle, and driving with worn tires. Again, Sueyres personally asked the municipal court to dismiss the charges in the interest of justice. Bolanos, once again, pled guilty to driving without a valid license and paid a $75 fine. None of these matters was disclosed to the defense.

At trial, Bolanos admitted on cross examination that he was testifying under court order in exchange for a grant of immunity and that he would face a murder charge if he refused to testify. However, Schick's efforts to impeach Bolanos were hampered by the fact that Bolanos continually minimized both his own culpability and the benefits he received from the prosecution in exchange for his testimony. For example, Bolanos told the jury that his motive in testifying was "to tell the truth," and he stated that because he "wasn't even around when the crime happened," he did not view the grant of immunity as a particular favor.

In addition, Bolanos was less than truthful when he testified about his prior contacts with law enforcement. When Schick questioned Bolanos about prior inconsistent statements that Bolanos had made to the police, Bolanos explained them by saying that he had made mistakes out of nervousness because it was "the first time I got busted." In fact, Bolanos had been "busted" twice before. In addition to the DUI/hit-and-run incident, Bolanos had previously been arrested for gun possession by Detective Holman, the same officer who arrested him for the McConnell murder. The arrest generated formal criminal charges, and Bolanos was sentenced to thirty days in a juvenile facility, of which he served fifteen.

### 2.   Giglio *Claim*

The prosecution has an affirmative duty to turn over to the defense all evidence favorable to the accused, including impeachment evidence. *Kyles v. Whitney*, 514 U.S. 419, 432 (1995); *Giglio v. United States*, 405 U.S. 150,154 (1972). The failure to disclose favorable evidence violates due process when the evidence is material. *United States v. Bagley*, 473 U.S. 667, 678 (1985); *Singh v. Prunty*, 142 F.3d 1157, 1161 (9th Cir. 1998). Evidence is material if there is a reasonable probability that, had it been disclosed to the defense, the outcome of the trial would have been different. *Bagley*, 473 U.S. at 682. A reasonable probability occurs when the suppression "undermines confidence in the outcome of the trial." *Kyles*, 514 U.S. at 434 (internal quotation marks omitted).

Belmontes argues that the prosecutor violated due process by failing to turn over material impeachment evidence consisting of the existence and unusual disposition of Bolanos' misdemeanor traffic offenses. The state responds that the prosecutor had no duty to disclose this evidence because the misdemeanor violations were not mentioned in the plea agreement and were not dismissed as consideration for Bolanos' testimony against Belmontes. In support of this argument, the state cites the deposition testimony of both Bolanos and his

attorney to the effect that they did not perceive the dismissal of the traffic offenses as related to the immunity deal.

**[1]** The state's argument is without merit. We have held that when the state relies on the testimony of a criminal informant, it has an obligation to disclose "all information bearing on that witness's credibility," including "the witness's criminal record . . . and any information therein which bears on credibility." *Carriger v. Stewart*, 132 F.3d 463, 480 (9th Cir. 1997). We further emphasized the importance of this rule in *Benn v. Lambert*, in which we held that "the state cannot satisfy its *Brady* obligation to disclose exculpatory and impeachment evidence by making some evidence available and asserting that the rest would be cumulative. Rather, the state is obligated to disclose all material information casting a shadow on a government witness's credibility." 283 F.3d 1040, 1057-58 (9th Cir. 2002) (internal quotation marks omitted). Here, the fact that the prosecutor personally appeared in municipal court to argue for favorable dispositions of Bolanos' misdemeanor traffic offenses casts a shadow on Bolanos' credibility regardless of whether such intervention was mentioned in the plea agreement or offered as consideration for Bolanos' testimony. Had defense counsel known about the existence and disposition of the misdemeanor offenses, he could have impeached Bolanos by showing that he had a motive to say what the prosecution wanted to hear in hopes of obtaining a lighter sentence on his plea to second degree burglary. Even though Bolanos was not explicitly promised leniency, the fact that the prosecutor helped Bolanos obtain dismissals or reduced punishments on his traffic misdemeanors makes it more likely that he would intercede on Bolanos' behalf when it came time for sentencing on the burglary charge. Thus, the evidence was clearly relevant and admissible for purposes of impeachment, and the district attorney should have disclosed it.

**[2]** Nevertheless, we hold that Belmontes' *Giglio* claim fails because, under the particular facts and circumstances of

this case, the undisclosed evidence was not material. This case presents different circumstances from those in *Benn*, in which we held that the prosecutor's dispensation of similar favors on behalf of his star witness—including quashing a traffic ticket, dismissing a burglary charge, and postponing the filing of an arrest warrant until after Benn's trial—were material benefits. *Id.* In *Benn*, we held that the failure to disclose these benefits necessitated a new trial, even though the prosecutor disclosed that he had made a deal with the informant to seek a reduced sentence in exchange for his testimony against Benn, and defense counsel impeached the informant on this point. *Id.*

Aside from the fact that the undisclosed benefits in *Benn* may well have been more substantial than those at issue here, *Benn* is distinguishable for three reasons. First, Bolanos was actually involved in the McConnell murder, whereas the informant in *Benn* was a jailhouse snitch. Evidence that a jailhouse snitch received material benefits from the prosecution is especially important because without that evidence the informant masquerades as a disinterested observer. *See United States v. Bernal-Obeso*, 989 F.2d 331, 333-34 (9th Cir. 2002) (describing practice of relying on criminal informants as "fraught with peril"). In this case, however, Bolanos was cross-examined extensively as to his role in the crime and the details of his immunity agreement, so the jury could not possibly have viewed him as disinterested. Second, the impeachment evidence that was disclosed in *Benn* was relatively trivial; although the informant received sentencing leniency in his unrelated case, the leniency saved him only thirty-five days of jail time. *Benn*, 283 F.3d at 1057. Accordingly, "the number and nature of the undisclosed benefits was such that they would have impeached [the witness] more effectively" than the benefits that were disclosed. *Id.* at 1058. By contrast, in the present case the impeachment evidence that was disclosed was substantial: an agreement allowing Bolanos to plead guilty to second-degree burglary and receive immunity for the murder in exchange for his testimony. Finally, in *Benn*

the prosecutor effectively downplayed the importance of the impeachment evidence in his closing argument. *Id.* (quoting prosecutor's argument that "[t]he reward he got was that in a 6 to 12 month sentence, he got six months instead of nine months. Big reward."). In this case, however, the prosecutor argued that the jury should view Bolanos' testimony critically, and the jury was so instructed. For these reasons, we conclude that *Benn* does not control our analysis here.

**[3]** Here, the undisclosed benefits were not material because there is not a reasonable probability that the outcome of the trial would have been different if defense counsel had known about them. In making this judgment, we realize that Belmontes need not pass a sufficiency of the evidence test. *Kyles*, 514 U.S. at 434. "However, our fundamental concern remains whether there exists a reasonable probability that given disclosure of the evidence of benefits to [the witness], one or more members of the jury would have viewed [his] testimony in a different light." *Singh*, 142 F.3d at 1163. In this case, Bolanos was impeached with his immunity agreement, including the fact that the charges filed against him were substantially lower than the evidence would have warranted. The withheld evidence would not have added much, if anything. Moreover, Bolanos' testimony was corroborated by that of several other witnesses, including disinterested witnesses like Lucy Flores and Barbara Murillo, who were not involved in the crime or related to the codefendants. Belmontes' testimony to the contrary was uncorroborated and did not hold up well under cross examination. Had Bolanos' testimony been less well-supported or the undisclosed benefits been greater, or had the prosecutor not urged and the judge not instructed the jury to view his testimony with suspicion, we might conceivably have reached a different conclusion. Nevertheless, given the extent of the corroborating evidence, the relative unimportance of the undisclosed benefits as compared to those that were disclosed, and the nature of the prosecutor's statement, we cannot say that the jury would have viewed Bolanos' testimony in a different light had it known that the

prosecutor had helped him to quash his misdemeanor traffic offenses or obtain lighter punishment on them. In short, the undisclosed benefits do not undermine our confidence in the verdict. In these circumstances, we hold that the withheld evidence was not material, and the claim must, therefore, be denied.

### 3.  Napue *Claim*

Belmontes also argues that the prosecution violated his due process rights by failing to correct Bolanos' false assertion that he had never been "busted" before. The prosecutor has an independent, constitutional duty to correct testimony he knows to be false. *Napue v. Illinois*, 360 U.S. 264, 269-70 (1959); *N. Mariana Islands v. Bowie*, 243 F.3d 1109 (9th Cir. 2001). If there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury," the conviction must be set aside. *United States v. Agurs*, 427 U.S. 97, 103 (1976).

The state argues that the prosecution had no duty to correct the record because defense counsel was notified of the drunk-driving arrest at a pretrial hearing. Whether defense counsel is aware of the falsity of the statement is beside the point. The state overlooks the fact that the prosecutor's duty to correct false testimony arises, not simply out of a duty of fairness to the defendant, but out of "the free standing constitutional duty of the State and its representatives to protect the system against false testimony." *Bowie*, 243 F.3d at 1118. Therefore, regardless of whether defense counsel should have known that a state witness testified falsely, "[a] prosecutor's 'responsibility and duty to correct what he knows to be false and elicit the truth,' *Napue*, 360 U.S. at 269-70, 79 S. Ct. 1173, requires [him] to act when put on notice of the real possibility of false testimony." *Id.*

The state also contends that the prosecution had no duty in this case because the word "busted" is ambiguous, and there-

fore Bolanos may not have testified falsely at all. We do not find the word "busted" to be ambiguous. *See Webster's New World Dictionary* 189 (3d college ed. 1988) (defining "bust" as "to arrest"). In this case, the prosecutor knew that Bolanos had been "busted" twice before: once for DUI/hit-and-run and once for gun possession. He had an independent duty to correct the false testimony and elicit the truth.

If there were any reasonable likelihood that Bolanos' false testimony could have affected the judgment of the jury, we would be compelled to grant the petition with respect to this claim. Belmontes argues that a reasonable likelihood exists, pointing to the fact that the "first time I got busted" comment arose at a crucial part of defense counsel's cross-examination. Bolanos used this false statement to explain his prior inconsistent statements on two critical points: the length of time Vasquez spent in the house and the alleged knocking noise that Bolanos heard when he got out of the car to open the trunk. He stated that he was nervous when he made the prior inconsistent statements to the officer because he had never been busted before. The testimony that was inconsistent was important because it tended to incriminate Belmontes and exculpate Vasquez by suggesting that McConnell was killed before Vasquez entered the house; it also was not directly corroborated by any other witness. Conceivably, if the jury knew that Bolanos had lied when trying to explain his prior inconsistent statements on these points, it could have concluded that Bolanos was lying about the timing and the knocking noise, either to please the prosecution or to protect Vasquez. The jury then would have been more likely to believe Belmontes' testimony that Vasquez was the actual killer.

Ultimately, however, we do not believe that Bolanos' false testimony regarding the absence of prior arrests could have affected the judgment of the jury. As we explained, his testimony regarding the events surrounding the murder was in most respects corroborated by independent witnesses. Furthermore, the most damaging testimony of the trial came from

Belmontes himself. On cross-examination, Belmontes conceded that for his version of events to be true, Vasquez would have had to have come directly from the car to the door without attempting to open the trunk, and there is direct evidence to the contrary from a disinterested eyewitness. Moreover, Belmontes refused to say that he had seen or heard Vasquez hitting McConnell, and he could not explain how Vasquez would have had enough time to both murder McConnell and ransack the front bedroom. Finally, Belmontes, but not Vasquez, had blood sprinkled on his clothes and shoe. On this record, we hold that there is no reasonable likelihood that Bolanos' false testimony that his arrest in connection with the McConnell murder was "the first time I got busted" would have affected the judgment of the jury. We therefore deny relief on this claim.

### B.    Conflict of Interest

Belmontes contends that he was deprived of due process and the effective assistance of counsel due to a conflict of interest arising from Schick's multiple prior representations of Vasquez. *See Cuyler v. Sullivan*, 446 U.S. 335 (1980). At the heart of the claim is the allegation that Schick, because of the conflict of interest, did not offer evidence of Vasquez's violent criminal history in support of his defense theory that Vasquez was the actual killer.[5] Belmontes argues that this evidence was relevant and admissible for two purposes: first, to show that Vasquez was, in fact, the actual killer; and second,

---

[5]Belmontes also argues that the trial judge independently violated his due process rights by failing to inquire adequately into the conflict and failing to advise Belmontes about the nature and consequences of the conflict. We do not address this claim because Belmontes cannot prevail on it without showing that Schick labored under an actual conflict of interest that adversely affected his defense, a showing Belmontes cannot make for the reasons explained hereafter. *Mickens v. Taylor*, 535 U.S. 162 (2002) (extending *Cuyler* burden of proof to situations in which trial judge failed to inquire into conflict about which he knew or reasonably should have known).

to impeach Bolanos' credibility by showing that his fear of retaliation by Vasquez caused him to place the blame on Belmontes, rather than on the true murderer.

### 1. Factual Background

During pretrial proceedings, Vasquez's attorney brought a motion to recuse Schick as counsel for Belmontes. The motion was based on the fact that Schick's law firm had represented Vasquez in a 1979 murder case; Vasquez's attorney feared that Schick had confidential information that he would use against Vasquez as part of his defense theory that Vasquez was the actual killer.[6] Schick opposed the motion and filed a declaration in which he stated: (1) the attorney who represented Vasquez in 1979 had since left the firm; (2) the case against Vasquez was dismissed prior to trial; (3) he himself had acquired no confidential communications from Vasquez; and (4) the case file had been destroyed eight months earlier. The trial judge held a hearing and, based on these facts, denied the motion. The judge asked Belmontes if he wished to retain Schick as his lawyer, knowing that Schick's firm had previously represented Vasquez. Belmontes said that he did.

In postconviction proceedings, Belmontes' attorneys learned that Schick's connection to Vasquez was, in fact, much more extensive than he had disclosed to either Belmontes or the trial court. Prior to entering private practice, Schick and the members of his criminal defense firm had worked at the local public defenders' office. There, Schick and the members of his firm represented Vasquez on three occasions in addition to the 1979 murder charge. In August

---

[6]Earlier, Vasquez's counsel had successfully moved to recuse Schick's investigator. This investigator had previously worked on Vasquez's 1979 murder case, and at the time of Belmontes' trial he worked part-time in the public defender's office, which represented Vasquez in the McConnell murder.

1974, Schick had himself represented Vasquez on a gun possession charge; he had helped Vasquez negotiate a guilty plea. In November 1974, Patrick Riddle, a partner in Schick's law firm, had represented Vasquez on a rape charge.[7] In January 1976, Douglas Jacobsen, the third partner in Schick's firm, had represented Vasquez in a purse-snatching case that went to jury trial. Schick did not notify Belmontes or the court of these incidents of representation even though he remembered them at the time of the recusal motion.

In 1994, Schick signed another declaration with respect to the conflict of interest claim. In that declaration, he averred that at the time of the recusal motion, he saw no relationship between any of Vasquez's prior cases and the McConnell murder. He asserted that his representation of Belmontes was not inhibited by his prior representation of Vasquez and that his loyalty to Belmontes was complete and undivided. Schick stated that he considered calling Vasquez as a witness and would have been prepared to cross examine him fully had he taken the stand. However, he also admitted that he did not investigate Vasquez's violent criminal history even though doing so would have been helpful to Belmontes' defense. Schick stated that he did not make a tactical decision not to pursue this investigation. He explained that his normal procedure is to investigate the criminal record of a potential witness; however, he did not consider Vasquez a potential witness until after he had entered a guilty plea.

Schick testified at his deposition that he knew that he had a continuing duty of loyalty to Vasquez, but he did not view Belmontes' defense as conflicting with that duty in any way. However, Schick admitted that he knew that the district attorney could revive the 1979 murder charge against Vasquez at any time (although he also stated that it never crossed his mind that the prosecution would do so as a result of any evi-

---

[7]Schick avers that he was not aware of this case at the time he represented Belmontes.

dence Schick presented at Belmontes' trial). In addition, Schick recognized that even though Vasquez entered his guilty plea prior to Belmontes' trial, Vasquez had an ongoing liberty interest in being viewed as an aider and abettor in the McConnell murder, and not the actual killer.

### 2. *Discussion*

At the outset, we dispose of the state's procedural objections to the claim. The state first contends that the claim is unexhausted because Belmontes did not present to the California Supreme Court all of the facts underlying the claim. This argument fails because "new factual allegations do not render a claim unexhausted unless they 'fundamentally alter the legal claim already considered by the state courts.' " *Chacon v. Wood*, 36 F.3d 1459, 1468 (9th Cir. 1994) (quoting *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986)). Here, although the additional facts add some evidentiary support to the claim, they do not "fundamentally alter" it. *See Weaver v. Thompson*, 197 F.3d 359, 364 (9th Cir. 1999) (holding that jury misconduct claim was properly exhausted when petitioner presented incidents of improper jury contact that differed in number, but not in kind, from what was presented to state courts). The essential factual and legal theories are the same as those presented to the California courts. Therefore, Belmontes adequately exhausted the claim.

Next, the state argues that the claim is barred by the *Teague* nonretroactivity doctrine. *See Teague v. Lane*, 490 U.S. 1031 (1989). The government bases this argument on the Supreme Court's recent statement that, as far as its own precedent is concerned, the question whether *Cuyler* extends to cases of successive representation is still open. *Mickens v. Taylor*, 535 U.S. 162, ___, 122 S. Ct. 1237, 1246 (2002). However, we have held that circuit court holdings suffice to create a "clearly established" rule of law under *Teague*. *Bell v. Hill*, 190 F.3d 1089, 1091 (9th Cir. 1999). In this circuit, it was well-established at the time that Belmontes' conviction

became final that conflicts of constitutional magnitude can arise from cases of successive representation. *See, e.g., Mann-halt v. Reed*, 847 F.2d 576, 579 (1988); *United States v. Wheat*, 813 F.2d 1399, 1402 & n. 1 (9th Cir. 1987), *aff'd on other grounds*, 486 U.S. 153 (1988). Accordingly, the conflict claim is not *Teague*-barred.

We also hold that Belmontes' purported waiver of the conflict of interest was invalid. "For a waiver to be knowing and intelligent, the defendant must have been sufficiently informed of the consequences of his choice." *Lockhart v. Ter-hune*, 250 F.3d 1223, 1232 (9th Cir. 2001) (internal quotation marks and citations omitted). Here, Schick failed to inform Belmontes or the court of the extent of his prior relationship with Vasquez. In addition, neither Schick nor the trial judge explained to Belmontes that Schick owed a continuing duty of loyalty to Vasquez, a duty that could potentially conflict with Belmontes' defense theory—that Vasquez was McConnell's actual killer. Under these circumstances, we conclude that Belmontes was not sufficiently informed of the consequences of his choice, and his waiver was therefore invalid. *See Lock-hart*, 250 F.3d at 1252-53, citing *United States v. Curcio*, 680 F.2d 965, 976-77 (8th Cir. 1982) (holding that waiver was ineffective when the defendant was informed of possible conflict due to attorney's prior representation of codefendant and told that conflict may arise from prior confidential communications, but not told that conflict may arise from attorney's continued loyalty to codefendant).

**[4]** To establish a Sixth Amendment violation based on conflict of interest, the defendant must show that an actual conflict of interest adversely affected his lawyer's performance. *Cuyler*, 446 U.S. at 338; *Mannhalt*, 847 F.2d at 579. Generally, it is more difficult to demonstrate an actual conflict resulting from successive, rather than simultaneous, representation. *Mannhalt*, 847 F.2d at 580. Conflicts of interest based on successive representation may arise if the current and former cases are substantially related, if the attorney reveals

privileged communications of the former client, or if the attorney otherwise divides his loyalties. *Id.* Ultimately, however, an actual conflict of interest is one "that affected counsel's performance—as opposed to a mere theoretical division of loyalties." *Mickens*, 122 S. Ct. at 1243. In other words, the simple "possibility of conflict is insufficient to impugn a criminal conviction." *Cuyler*, 446 U.S. at 350.

We must decide whether the potential conflict of interest engendered by Schick's prior representation of Vasquez ripened into an actual conflict. We begin by noting that there is no suggestion that Vasquez's prior cases were substantially related to the McConnell murder or that Schick was in possession of privileged communications from Vasquez. Therefore, if Belmontes is to demonstrate an actual conflict, he must show that Schick "divide[d] his loyalties" between Vasquez and Belmontes. *Fitzpatrick v. McCormick*, 869 F.2d 1247, 1252 (9th Cir. 1989), citing *Mannhalt*, 847 F.2d at 580. In engaging in this inquiry, we look beyond Schick's protestations to the contrary to see whether independent evidence in the record supports the allegation of divided loyalties. *United States v. Shwayder*, 312 F.3d 1109, 1119 (9th Cir. 2002) ("Human self-perception regarding one's own motives for particular actions in difficult circumstances is too faulty to be relied upon, even if the individual reporting is telling the truth as he perceives it."); *Sanders v. Rawtelle*, 21 F.3d 1446, 1452 (9th Cir. 1994) ("The existence of an actual conflict cannot be governed solely by the perceptions of the attorney; rather, the court itself must examine the record to discern whether the attorney's behavior seems to have been influenced by the suggested conflict.").

**[5]** After a careful examination of the record, we find no evidence that Schick divided his loyalties between Vasquez and Belmontes. Indeed, Belmontes' entire defense was that Vasquez was the killer. This case is thus distinguishable from cases like *Lockhart*, *Sanders*, and *Fitzpatrick*, all of which addressed situations in which defense counsel sabotaged their

current clients' case by refusing to raise the obvious defense that a former client was actually responsible for the murder. *See Lockhart*, 250 F.3d at 1230-31 (where the evidence showed that the same person had committed both an earlier murder and the murder for which defendant was on trial, defendant's trial counsel refused to present evidence that his former client had committed the earlier murder); *Sanders*, 21 F.3d at 1453 (defense counsel successively represented two brothers who were accused of the same murder; the first brother confessed his guilt to defense counsel, who advised him to take the Fifth at his brother's trial; at the trial, defense counsel put forth an unconvincing alibi defense rather than evidence that the first brother had committed the murder); *Fitzpatrick*, 869 F.2d at 1251-52 (defense counsel refused to present defense that a former client actually committed the murder; because of the prior attorney-client relationship, defense counsel believed in the former client's innocence to the detriment of his current client).

Belmontes argues nevertheless that an actual conflict of interest affected Schick's performance at his trial. According to Belmontes, even though Schick argued that Vasquez was the killer, he failed to support this theory with hard evidence. Belmontes asserts that Schick should have investigated Vasquez's lengthy criminal record and presented it as evidence that Vasquez was the actual killer. He also asserts that Schick should have impeached Bolanos by showing that he was in fear for his life due to death threats issued by Vasquez and thus had a powerful motive to falsely shift the blame from Vasquez to Belmontes. Belmontes argues that the only possible explanation for these lapses on Schick's part is that he felt bound by a continuing duty of loyalty to Vasquez, and that this duty required him to refrain from presenting evidence that could have resulted in the revival of the 1979 murder prosecution or impaired Vasquez's prospects for an early parole on his second degree murder conviction in the current case.

**[6]** We are of the view, however, that these alleged failings are too speculative to sustain a conflict of interest claim. This

is not a case in which Schick failed to present evidence that went directly to Vasquez's—and therefore Belmontes'—guilt or innocence. Rather, Schick sought squarely to place the blame on Vasquez, and did not overlook any direct evidence on that point. He simply failed to investigate and present evidence of Vasquez's prior bad acts, which, if admissible, might have marginally affected whether a jury would have had a reasonable doubt as to Belmontes' guilt. Given the absence of evidence suggesting that Vasquez was the actual killer and given the damaging nature of Belmontes' own conflicting statements, any counsel might have failed to investigate and offer evidence regarding Vasquez's criminal history. In short, we hold that this failure, standing alone, is not enough to show that Schick divided his loyalties between Vasquez and Belmontes. It is not "likely" that a conflict caused Schick to handle Belmontes' case as he did. *See United States v. Miskinis*, 966 F.2d 1263, 1268 (9th Cir. 1992). Thus, Belmontes has not shown that he was deprived of his Sixth Amendment rights by an actual conflict of interest.

## C.  *Involuntary Statement*

Belmontes argues that the prosecutor violated his due process rights by introducing into evidence his involuntary, inculpatory statements. However, Belmontes testified in his deposition that he spoke to the police freely and voluntarily. There was no due process violation here.

## D.  *Counsel's Failure to Challenge Arrest Warrant*

Belmontes claims that his trial counsel was constitutionally ineffective for failing to challenge his arrest warrant. He argues that the warrant in his case was facially insufficient to support a finding of probable cause because nothing in the warrant corroborated the allegation that Belmontes himself, as opposed to Bolanos, was involved in the crime.[8]

---

[8]The warrant reads:

Detective Elbert Holman, San Joaquin County Sheriff's Office,

*1.*   Strickland *Claim*

In order to prevail on his ineffectiveness claim, Belmontes must show that: (1) his trial counsel's performance fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To

---

will testify that: he responded to 17281 N. Sunrise St. Victor, CA on 3/15/81 in the early afternoon. The house was ransacked.

Deputy St. Sure will testify he was the first deputy Sheriff to arrive at 17281 N. Sunrise. Steacy McConnell was on the floor being administered to by medical personnel. Steacy McConnell subsequently died.

Dr. Madieros did the autopsy on Steacy McConnell. The cause of death was blunt trauma to the head.

Bob Bolanos, after being advised of his Miranda rights, waived those rights and told Detective the following: That he went to the home of Domingo Vasquez, Jr. He was with Fernando Delmontes on 3/15/81. While at the Vasquez house, Vasquez called Steacy McConnell. Thereafter, the three of them talked about the fact that Steacy possessed some expensive property at her residence. Fernando Delmontes said he needed money to send to his wife in Los Angeles. Delmontes decided to burglarize the McConnell residence after Vasquez told them McConnell would not be home. Vasquez and Bolanos agreed to go with Delmontes. Bolanos drive them to McConnell's in his car. Upon arriving in the vicinity, Delmontes got out, carrying an iron bar he had brought with him from Vasquez's house.

Delmontes told Bolanos to wait in the car for 30 minutes, then to drive to McConnell's and get him.

When they drove to McConnell's, they opened the trunk, and Vasquez went into the house. Vasquez carried stereo speakers from the house to the car trunk. Delmontes followed Vasquez out with the receiver portion of the stereo. Delmontes was splattered with blood. Vasquez was not. Delmontes said McConnell was in the house, and when Bolanos drove up, he beat her with the iron bar. The stereo was later sold, and the proceeds divided.

satisfy *Strickland*'s prejudice prong in a Fourth Amendment context, Belmontes must demonstrate a reasonable probability that a motion to suppress would have succeeded and that the suppression of the warrant would have led to a different outcome at the trial. *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). The reasonableness of counsel's performance is evaluated from counsel's perspective at the time of the alleged error. *See id.* at 384.

At the time of Belmontes' trial, the federal *Aguilar-Spinelli* test applied to affidavits supporting warrant applications. *Aguilar-Spinelli* did not require independent corroboration of the facts set forth in the affidavit. Rather, under *Aguilar-Spinelli*, the affidavit on its face had to provide enough information so that a magistrate could determine: (1) that the informant was reliable (the "veracity" prong); and (2) that his information was dependable (the "basis of knowledge" prong). *Spinelli v. United States*, 393 U.S. 410 (1969); *Aguilar v. Texas*, 378 U.S. 108, 114 (1964); *United States v. Larkin*, 510 F.2d 13, 15 (9th Cir. 1974). Under federal law, the affidavit met both prongs. Because the affidavit stated that Bolanos acquired his information through first-hand observation, it satisfied the "basis of knowledge" prong, *Aguilar*, 378 U.S. at 114, and because it contained a statement against penal interest, it satisfied the veracity prong. *United States v. Harris*, 403 U.S. 573, 583-84 (1971) (holding that, in most cases, statements against penal interest are inherently reliable); *but see United States v. Hall*, 113 F.3d 157, 159 (9th Cir. 1994) (declining to apply *Harris* to accomplice informant because "once a person believes that the police have sufficient evidence to convict him, his statement that another person is more important to his criminal enterprise than he gains little credibility from its inculpatory aspect").

Nor would the claim have had a reasonable probability of success under California law. According to the California Supreme Court, the affidavit contained sufficient corroboration to support a finding of probable cause:

> The circumstances of the crime and evidence found at the crime scene — as summarized in the affidavit — corroborated Bolanos' statement. . . . [T]rial counsel could reasonably have concluded that the affidavit contained sufficient corroboration of Bolanos's hearsay statement; that the arrest warrant thus issued on probable cause; and that a de novo motion to quash the warrant would have proved futile.

*People v. Belmontes*, 45 Cal. 3d 744, 768 (1988). We are bound by statements of the California Supreme Court as to California law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68, (1991) ("[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions."). Accordingly, we must conclude that Schick would not have had a reasonable probability of success in challenging the arrest warrant. Thus his failure to challenge the warrant does not constitute ineffective assistance of counsel.

### 2.   Franks *Claim*

Belmontes also alleges that material omissions in the affidavit caused the magistrate to issue a warrant for which there was no probable cause. *See Franks v. Delaware*, 438 U.S. 154, 156 (1978). Under *Franks*, if a criminal defendant establishes by a preponderance of the evidence that an officer recklessly omitted material information from the affidavit, and if the affidavit considered with the omitted evidence is insufficient to establish probable cause, then the "warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking." *Id.*

On appeal, Belmontes did not specify what evidence was omitted from the warrant, but he did refer to the California Supreme Court opinion, which described four categories of evidence: (1) The affiant, a police officer, was familiar with Vasquez's violent history but did not know Belmontes; (2)

Bolanos' car had been identified at the scene of the crime; (3) Bolanos offered his statement only after his car was impounded and his girlfriend had incriminated him; and (4) at first, Bolanos lied when speaking to the police. *Belmontes*, 45 Cal. 3d. at 769. Three of these omitted facts cast aspersions on Bolanos' credibility because they highlight his strong motive to shift the blame for McConnell's death to someone else. The fourth is plainly of no relevance. As to the three, the face of the affidavit makes clear that Bolanos was *Mirandized*, which itself indicates that Bolanos was a suspect in the crime. The omitted details add more color to Belmontes' claims, but they do not change the basic calculus involved in determining Bolanos' reliability. Accordingly, they are not material, and the *Franks* claim must be denied.

### E.  Doyle *Claim*

Belmontes asserts that the prosecutor violated his due process rights by cross-examining him as to his post-arrest silence in violation of *Doyle v. Ohio*, 426 U.S. 610 (1976). However, the Supreme Court has held that *Doyle* does not apply to a defendant who has waived his *Miranda* rights and voluntarily given a statement to the police. *Anderson v. Charles*, 447 U.S. 404, 408 (1980). Belmontes testified in his deposition that he understood his *Miranda* rights, waived them, and spoke freely and voluntarily to the police. No *Doyle* error occurred.

### F.  *Unconstitutional Restriction on Cross Examination*

Belmontes contends that the trial judge violated his Sixth Amendment rights by unconstitutionally restricting his cross examination of Karrie Lynn Vasquez, Vasquez's wife. Ms. Vasquez testified that she saw Belmontes take the iron bar from the kitchen and heard him admit to killing McConnell. Defense counsel sought to impeach her testimony by demonstrating that she was lying in order to increase Vasquez's chances at an early parole by emphasizing Belmontes' greater

culpability. This strategy was foiled because the trial judge refused to allow defense counsel to question Ms. Vasquez as to her knowledge of the length of Vasquez's sentence.

The Confrontation Clause protects a defendant's right to cross examine witnesses as to potential bias. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). However, the trial judge retains considerable latitude to impose reasonable limits on cross-examination based on harassment, prejudice, confusion of the issues, and relevance. *Id.* Any error is subject to harmless error review. *Id.* at 684.

Despite the fact that the trial judge prevented defense counsel from exploring Ms. Vasquez's bias with respect to the length of Vasquez's sentence, defense counsel cross-examined her extensively and effectively. Defense counsel elicited testimony that Ms. Vasquez had known her husband for eight years, bore his child, stayed with him in spite of his frequent infidelity, married him while he was in prison for the McConnell murder, and visited him in jail every weekend. The jury thus had ample reason to believe that Ms. Vasquez was biased in favor of her husband. In addition, counsel forced Ms. Vasquez to admit that, although she had been questioned extensively during the police investigation, it was not until the day before Belmontes' trial that she first claimed to have heard him admit to the crime. This testimony strongly suggested that Ms. Vasquez was lying about what she claimed to have heard. Ms. Vasquez could not have been impeached much more effectively.

In light of the extensive and effective cross-examination that occurred, and the minimal amount of additional force the excluded material would have added, the error, if any, could not have had a substantial and injurious effect on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993). Accordingly, we deny relief on this claim as well.

## G.   Evidentiary Errors

Belmontes argues that his trial was rendered fundamentally unfair by the introduction of hearsay and double-hearsay statements supporting Bolanos' testimony that Belmontes was the actual killer. However, the California Supreme Court held that these statements were properly admitted prior consistent statements. We are bound by the opinion of the California Supreme Court in these matters of state law. *Estelle*, 502 U.S. at 67-68. As the Court has stated, "the Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules." *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983). Here, the statements added little and did not render the trial fundamentally unfair.

## H.   Instructional Error

Belmontes also challenges an instruction directing the jury not to speculate as to why other individuals involved in the crime were not on trial along with Belmontes. He claims that this instruction prevented the jury from considering the impact of Bolanos' immunity agreement on his credibility. We must determine "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72 (internal quotation marks omitted). We conclude that it did not, because the jury was also instructed that it should view Bolanos' testimony with suspicion due to his involvement in the crime. Accordingly, we deny this claim also.

## I.   Fair Cross-Section

Belmontes alleges that he was deprived of a jury comprised of a fair cross-section of the community because of the systematic exclusion of minority jurors from the venire. However, he provides no statistical data in support of his claim. Belmontes' claim is thus barred by our decision in *Thomas v.*

*Borg*, 159 F.3d 1147 (9th Cir. 1998). In that case, the petitioner argued that we should excuse his failure to provide the necessary statistical evidence because his trial counsel was constitutionally ineffective for failing to preserve it. *Id.* at 1150. We held:

> [F]or purposes of our fair cross-section analysis, the reason for Thomas' lack of evidence is immaterial. Because Thomas has provided us with insufficient statistical evidence to determine whether blacks were substantially underrepresented on jury venires or panels in Kern County at the time of his trial, his Sixth Amendment fair cross-section claim must be denied.

*Id.* at 1150-51. Applying *Thomas* to the facts of this case, we must deny the claim.

### J.   Jury Misconduct

Belmontes contends that the district court erred in denying him an evidentiary hearing on his juror misconduct claims. A habeas petitioner must meet two conditions to be entitled to a federal evidentiary hearing: He must (1) allege facts which, if proven, would entitle him to relief, and (2) show that he did not receive a full and fair hearing in a state court, either at the time of the trial or in a collateral proceeding. *Id.* at 1126-27. A petitioner who meets these conditions must receive a hearing. *See, e.g., Williams v. Taylor*, 529 U.S. 420 (2000) (holding that because prisoner diligently pursued claim in state court, and was denied a hearing, he was entitled to a hearing in federal court); *United States v. Navarro-Garcia*, 926 F.2d 818, 822 (9th Cir. 1991) ("Unless the court is able to determine without a hearing that the allegations are without credibility or that the allegations if true would not warrant a new trial, an evidentiary hearing must be held.").

Belmontes first asserts that the jurors based their decision on the view that "life without possibility of parole did not

mean that Belmontes would spend the rest of his life in prison." Belmontes is not entitled to relief on this claim because it concerns intrinsic jury processes. "[I]ntrinsic jury processes will not be examined on appeal and cannot support reversal." *United States v. Bagnariol*, 665 F.2d 877, 887 (9th Cir. 1981).

Belmontes next alleges that the jurors had improper contacts with members of the victim's family. He bases this contention on an excerpt from the record in which the trial court reprimanded one of the jurors for talking to the victim's father about motorcycles. After the reprimand, the trial court conducted a hearing and determined that the juror was not biased as a result of his contact with the victim's father. Belmontes does not assert either that the hearing was not full or that it was not fair. Nor does he assert that he has any newly discovered evidence. Accordingly, he is not entitled to a federal evidentiary hearing on this claim.[9]

Third, Belmontes asserts that several jurors prejudged his guilt and engaged in premature deliberations. However, even assuming that the jurors did the latter, Belmontes would not necessarily be entitled to relief. *See, e.g., United States v. Klee*, 494 F.2d 394, 396 (9th Cir. 1974) (denying motion for new trial even though jurors discussed the case during breaks and expressed premature opinions about the defendant's guilt). A petitioner must allege facts which, if proved, would show that the premature deliberations prejudiced him to the extent that he did not receive a fair trial. *United States v. Hendrix*, 549 F.2d 1225, 1229 (9th Cir. 1977). Belmontes has not done so here; indeed, he has not alleged any facts other than that premature deliberations took place.

---

[9]Moreover, the state court's factual determination is subject to a presumption of correctness. *Patton v. Yount*, 467 U.S. 1025, 1037 n.12 (1984); 29 U.S.C. § 2254(d) (1994). To overcome the presumption, Belmontes must establish by clear and convincing evidence that the state court's factual finding was erroneous. *Patton*, 467 U.S. at 1037 n.12. However, he submitted no evidence tending to overcome the presumption, and the record contains none.

As to the alleged juror prejudgment, in his Amended Petition for Writ of Habeas Corpus, Belmontes contends that "[a] sitting juror remarked, 'Here comes the killer,' whenever petitioner was brought into court." While this claim, if true, might possibly entitle him to relief, *see Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998) (en banc) ("The bias or prejudice of even a single juror would violate [a criminal defendant's] right to a fair trial."), Belmontes did not include the issue in his request for an evidentiary hearing or present any facts that would entitle him to relief. Accordingly, the district court did not err in failing to afford him a hearing on that claim.

Because Belmontes has not alleged facts that, if true, would entitle him to relief, we affirm the district court's denial of an evidentiary hearing on his jury misconduct claims.

## VI.  SPECIAL CIRCUMSTANCES ISSUES

### A.  *Racial Discrimination in Charging*

Belmontes alleges that the charging decision in his case violated the Eighth Amendment and the Equal Protection Clause because it was infected by racial discrimination against defendants whose victims were white. In support of his claim, Belmontes relies on an expert report prepared by Richard Berk, a well-respected professor of sociology and statistics at the University of California, Los Angeles. Berk analyzed prosecutors' charging decisions in 122 death-eligible homicides committed in San Joaquin County from August 1977 through 1986.[10] In order to describe accurately the role of race and ethnicity in death penalty charging, he coded data for over 450 variables. After running numerous logistic regression tests, Berk concluded that the odds of being charged with special circumstances varied significantly according to the race of the victim. A defendant who killed a white person was five times more likely to be charged with special circumstances than a defendant who killed an African American and twenty times more likely to be charged than if the victim were Latino. Predictably, however, the government's experts reviewed Berk's report and the underlying data and opined that the data did not reveal a pattern of discriminatory charging in San Joaquin County. For the purposes of this opinion, we assume the accuracy and statistical validity of the Berk report.[11]

---

[10]The data set consisted of probation department reports for all death-eligible homicides charged during the relevant time period, except 70 cases for which the County lacked complete reports, 52 cases in which the defendants were not bound over for trial on murder charges, and six cases in which the defendants were female.

[11]The district court questioned the relevance of the Berk report on the ground that Berk based his conclusions on "a model that used only four non-racial factors." Although the tables printed in the report contained only four non-racial variables, the report stated that Berk and his team

Belmontes' claim of discriminatory charging is essentially a selective prosecution claim, and we analyze it under that rubric. Selective prosecution doctrine, however, poses significant hurdles for Belmontes. The government retains broad discretion as to whom to prosecute. *Wayte v. United States*, 470 U.S. 598, 607 (1985). Because the decision to prosecute is based on such factors as the strength of the case, the government's enforcement priorities, and the case's relationship to those priorities, the Supreme Court has stated that such decisions are "particularly ill-suited to judicial review." *Id.* at 607. Therefore, a presumption of regularity supports prosecutorial judgments, and "in the absence of clear evidence to the contrary, courts presume that [prosecutors] have properly discharged their official duties." *United States v. Armstrong*, 517 U.S. 463, 464 (1996) (quoting *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926)). "So long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978).

**[7]** Yet, there is a line the prosecution may not cross. Although prosecutorial discretion is broad, it is not unlimited. *United States v. Batchelder*, 442 U.S. 114, 125 (1979). Rather, "a prosecutor's discretion is 'subject to constitutional constraints.'" *Armstrong*, 517 U.S. at 464 (quoting *Batchelder*, 442 U.S. at 125). The decision to prosecute may not be based upon an unjustifiable standard such as race, religion, or other arbitrary classification, including the exercise of protected statutory and constitutional rights. *Armstrong*, 517 U.S.

---

actually considered many other variables in addition to those set forth in the tables. In his declaration, Berk characterized the small, six-variable model as "simply a summary" and stated that he considered all the variables in the data set, which included many non-racial factors. We have no reason to disbelieve Berk's sworn statement and can only conclude that the district court was mistaken.

at 464; *Wayte*, 470 U.S. at 608. Likewise, the decision to charge the death penalty cannot rest on criteria that offend the Constitution. *McCleskey v. Kemp*, 481 U.S. 277, 293 (1987); *Adamson v. Ricketts*, 865 F.2d 1011, 1022-23 (9th Cir. 1988) (en banc), *abrogated on other grounds*, *Walton v. Arizona*, 497 U.S. 639 (1990), *overruled*, *Ring v. Arizona*, 536 U.S. 584 (2002).

[8] In order to prevail on a selective prosecution claim, a defendant must show that the prosecutorial policy both had a discriminatory effect and was motivated by a discriminatory purpose. *Armstrong*, 517 U.S. at 465; *see also McCleskey*, 481 U.S. at 292 ("[T]o prevail under the Equal Protection Clause, [a defendant] must prove that the decisionmakers in *his* case acted with discriminatory purpose."). To establish a discriminatory effect in a race discrimination case, a defendant must prove that similarly situated individuals of a different race, or whose victims were of a different race, were not prosecuted. *Armstrong*, 567 U.S. at 467.[12]

_____

[12]In *Armstrong*, the Supreme Court stated that "[t]o establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals *of a different race* were not prosecuted. 517 U.S. at 465 (emphasis added). Belmontes' statistics do not meet this showing. Nevertheless, although Belmontes' claim is based on the race of his victim, not his own race, we do not read this sentence as barring our review. In *McCleskey*, the court examined a statistical study that showed statistical disparities according to the race of the victim. 481 U.S. at 286-87. In that case, the State argued that McCleskey did not have standing to raise a discrimination claim based on his victim's race. *Id.* at 291 n.8. The Court concluded that McCleskey did have standing to raise this claim, *id.*, and it addressed directly McCleskey's argument that he was "discriminated against . . . because of the race of his victim." *Id.* at 292. *Armstrong* did not discuss the issue of the victim's race at all, nor did the majority opinion even mention *McCleskey*. That question was simply not before the Court. In short, we are confident that *Armstrong* did not intend to overrule the pertinent portion of *McCleskey*. Accordingly, we conclude that a defendant may bring a selective prosecution claim based solely on the race of his victim, and that to establish a discriminatory effect in a race-of-the-victim case, he must show that similarly situated individuals whose victims were of a different race were not prosecuted.

**[9]** We reject the government's contention that the Supreme Court rejected similar statistical evidence in *McCleskey v. Kemp*, and that Belmontes' statistics are therefore "insufficient as a matter of law." The factual showing made by McCleskey was materially different from the showing made in this case. In *McCleskey*, the Supreme Court reviewed the claim of a Georgia prisoner who alleged that the Georgia capital sentencing statute violated the Equal Protection Clause because it was administered in a racially discriminatory manner. 481 U.S. at 286. In support of his claim, McCleskey offered a sophisticated statistical study that demonstrated that Georgia defendants whose victims were white were 4.3 times as likely to receive a death sentence as those whose victims were black. *Id.* The Court denied his claim, holding that McCleskey's statewide statistics did not meet his burden of proving that the imposition of the death penalty in his particular case was the product of purposeful discrimination. *Id.* at 293. We have similarly refused to allow petitioners in California and Arizona to submit statistics that demonstrated racial disparities in the imposition of the death penalty statewide as evidence of discrimination in an individual case. *See Carriger v. Lewis*, 971 F.2d 379, 334 (9th Cir. 1992) (en banc) (Arizona); *Harris v. Pulley*, 885 F.2d 1354, 1374-75 (9th Cir. 1989) (California). Unlike McCleskey, Carriger, and Harris, however, Belmontes offered statistics that provided information limited to the charging entity—the San Joaquin County District Attorney's Office—and its death penalty charging practices over time. Thus he provided what the statistics in *McCleskey* lacked: information specific to the decisionmaker in his case. We conclude that statistics relating to the charging entity, such as those presented by Belmontes, are materially more probative of discrimination in capital charging than those considered by the Supreme Court in *McCleskey*. *See United States v. Bass*, 122 S. Ct. 2389, 2389 (2002) (approving of "a showing regarding the record of the decisionmakers in respondent's case"). Thus, Belmontes' proffered statistics are not barred by *McCleskey* and may support a prima facie showing of unlawful charging discrimination.

**[10]** We next confront the question whether Belmontes' proffered statistical evidence proves a "discriminatory effect" under *Armstrong*. The statistics show that defendants whose victims were white were charged with special circumstances 30% of the time, whereas similarly situated defendants whose victims were African American or Latino were charged with special circumstances only 19% and 6% of the time, respectively. Because Belmontes' statistics revealed that individuals whose victims were white were far more likely to be charged with a capital offense than similarly situated individuals whose victims were non-white, we conclude that Belmontes established the requisite discriminatory effect. *See id.* (approving of statistical evidence that assesses whether similarly situated individuals were treated differently).

Under *Armstrong*, however, a discriminatory effect is not enough; Belmontes must also show that the decisionmakers in his case acted with a discriminatory purpose. *Armstrong*, 517 U.S. at 465. Here, Belmontes must show that the San Joaquin County District Attorneys Office pursued a death sentence in his case "at least in part because of" the race of his victim. *Wayte*, 470 U.S. at 610 (internal quotation marks omitted). Because Belmontes offered no non-statistical evidence on this point, we must decide whether his statistical evidence constitutes a prima facie showing of an intent to discriminate on the part of San Joaquin County District Attorney's Office.

The Supreme Court has not determined whether statistics relating exclusively to the prosecuting authority are sufficient, standing alone, to establish a prima facie claim of discriminatory intent in a capital charging case. On the one hand, the Court "has accepted statistics as proof of intent to discriminate in certain limited contexts," *McCleskey*, 481 U.S. at 293, and has held that appropriate statistics may be enough to establish a prima facie case in a number of circumstances, including challenges to the composition of the jury venire, *id.*, Title VII employment discrimination, *id.* at 294, legislative redistricting, *Hunt v. Cromartie*, 526 U.S. 541, 548-49 (1999),

and contemporaneous challenges to a prosecutor's acts. *See, e.g., Batson v. Kentucky*, 476 U.S. 79 (1986). In addition, the Court has recently reaffirmed *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), in which the petitioner, a Chinese laundry owner, relied entirely on statistics to prove that the City of San Francisco engaged in purposeful discrimination. *See, e.g., Armstrong*, 517 U.S. at 464-65; *McCleskey*, 481 U.S. at 293 & n.12. On the other hand, the Court has held that statistical evidence, standing alone, is not enough to make out a prima facie case of discrimination with respect to a jury's verdict. *See McCleskey*, 481 U.S. at 294-96 & 295 n.14. Although language in *McCleskey* suggests the "impropriety" of requiring a prosecutor to explain his charging decision years after it was made, *id.* at 296 & n.17, the Court acknowledged that, generally, when a petitioner makes out a prima facie case of discrimination, a prosecutor must provide an explanation. *Id.* & n.18.[13]

**[11]** While we think that Belmontes' statistics provide a strong showing of intentional discrimination, we need not decide whether, in a discriminatory charging case, statistics standing alone can make out a prima facie case. Assuming *arguendo* that they can and that Belmontes has made out a prima facie case, here the State has provided evidence that is sufficient to overcome that showing. In his deposition, the prosecutor stated that when he decided to pursue a death sentence against Belmontes, he had reason to believe that prior to the McConnell murder Belmontes had shot and killed Jerry Howard. In short, the prosecutor asserted that he pursued a death penalty against Belmontes, not because of McConnell's

---

[13]We note that a decision to charge a capital rather than a non-capital offense is far more significant and important than a decision to challenge a particular juror. A charging decision is made with great deliberation over a period of time and is generally the product of a deliberative process involving more than one person. Moreover, unlike the case of a juror challenge, there is a full record of the relevant events that ordinarily contains all of the objective factors upon which the decision-making would have been based.

death alone, but because he believed that Belmontes had actually committed more than one murder. Moreover, the evidence in the record is sufficient to provide a good faith basis for such belief. Thus, there appears to be a legitimate, race-neutral reason for a prosecutor to seek a death sentence in this particular case, and therefore sufficient evidence to rebut the inference of discrimination raised by Belmontes' statistical study. More important, Belmontes does not challenge the state's assertion that the prosecutor's explanation is sufficient to rebut his prima facie case. In his brief, he does not contend that the fact that a defendant is a double murderer is not a valid reason for seeking the death penalty; nor does he argue that the statistics show that racial disparity exists with respect to cases in which the defendant has killed, or is believed to have killed, more than one victim. Accordingly, we conclude that, even if Belmontes' statistics were sufficient to raise a prima facie case of purposeful discrimination, the State has successfully rebutted it by offering the prosecutor's legitimate, race-neutral explanation for his actions. We therefore deny the racial discrimination in charging claim.

### B.   Arbitrariness and Capriciousness in Charging

Belmontes also argues, independent of his discrimination claim, that the charging of special circumstances in his case was so arbitrary and capricious that it violated the Eighth Amendment. According to Belmontes, his crime was one of the least aggravated of death-eligible crimes, yet he was one of only a very few defendants to actually receive the death penalty. In contrast, many defendants who committed far more heinous crimes than he obtained lesser punishments. According to Belmontes, this disparity shows that in San Joaquin County at the time of his trial there was "no meaningful basis for distinguishing the few cases in which [a death sentence] is imposed from the many cases in which it is not." *Furman v. Georgia*, 408 U.S. 238, 313 (1972) (White, J., concurring). Belmontes argues that because the death penalty regime under which he was charged, convicted, and sentenced

is indistinguishable from that struck down in *Furman*, his sentence must be vacated as unconstitutionally arbitrary and capricious.

Belmontes' claim, however, although styled as one of arbitrary death penalty charging, is actually a claim of arbitrary *imposition* of the death penalty. He does not argue that the prosecutor's decision to *charge* him with special circumstances was arbitrary and capricious. Rather, he contends that it was arbitrary and capricious to impose the death penalty on him because other defendants who had committed more heinous crimes than he did not receive the death penalty. The Supreme Court considered and rejected this claim in *McCleskey*. 481 U.S. at 306-12. As we are bound by controlling precedent, we must do the same.

## VII.   PENALTY PHASE ISSUES

### A.   *Instructional Error*

Belmontes contends that the trial judge's instructions to the jury prevented it from considering nonstatutory mitigating circumstances relating to the likelihood that he would live a constructive life in prison and make positive contributions to others if granted life without the possibility of parole. Because we conclude that there is a reasonable probability that as a result of instructional error the jury did not consider constitutionally relevant mitigating evidence, and because we believe that the error was not harmless, we grant the petition with respect to the sentencing phase.

### 1.   *Factual Background*

At Belmontes' trial, the judge gave the jury the then-standard model jury instructions, modified to eliminate four factors that the prosecution and defense agreed had no relevance to the case. The jury was therefore instructed:

In determining which penalty is to be imposed on the defendant you shall consider all of the evidence which has been received during any part of the trial of this case, except as you may be hereafter instructed. You shall consider, take into account, and be guided by the following factors, if applicable:

(a)   The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true.

(b)   The presence or absence of any criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence.

(c)   The presence or absence of any prior felony conviction.

(d)   Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

(e)   Whether or not the defendant acted under extreme duress or the substantial domination of another person.

(f)   The age of the defendant at the time of the crime.

(g)   Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime.[14]

---

[14]To remain consistent with the text of the statute and the Supreme Court's terminology in *Boyde*, we will refer to this factor as "factor (k)" or "unadorned factor (k)."

The judge also gave the jury half of a supplemental instruction requested by the defense. The part that was given read:

> [T]he mitigating circumstances which I have read for your consideration are given to you merely as examples of some of the factors that you may take into account as reasons for deciding not to impose a death penalty or a death sentence upon Mr. Belmontes. You should pay careful attention to each of these factors. Any one of them standing alone may support a decision that death is not the appropriate punishment in this case.

The other half of the instruction, which the trial judge refused to give, stated: "[Y]ou should not limit your consideration of mitigating circumstances to these specific factors. You may also consider any other circumstances . . . as reasons for not imposing the death sentence."

After several hours of deliberations, the jury sent the judge a note asking, "What happens if we cannot reach a verdict?" and "Can the majority rule on life imprisonment?" The jury was brought back to the courtroom, and the judge reread a portion of the jury instructions, emphasizing that "all 12 jurors must agree, if you can." The jurors asked again what would happen if they could not agree, but the court refused to tell them.

The judge asked the jury: "Do you think if I allow you to continue to discuss the matter and for you to go over the instructions again with one another, that the possibility of making a decision is there?" The jurors agreed that they needed more time to deliberate. They then asked the following series of questions:

> JUROR HERN: The statement about the aggravation and mitigation of the circumstances, now, that was the listing?

THE COURT: That was the listing, yes, ma'am.

JUROR HERN: Of those certain factors we were to decide one or the other and then balance the sheet?

THE COURT: That is right. It is a balancing process. Mr. Meyer?

JUROR MEYER: A specific question, would this be an either/or situation, not a one, if you cannot the other [*sic*]?

THE COURT: No. It is not that.

JUROR MEYER: It is an either/or situation?

THE COURT: Exactly. If you can make that either/or decision. If you cannot, I will discharge you.

JUROR HAILSTONE: Could I ask a question? I don't know if it is permissible. Is it possible that he could have psychiatric treatment during this time?

THE COURT: That is something you cannot consider in making your decision.

### 2. *Discussion*

The California death penalty statute has a unique mechanism for guiding the jury's discretion. Instead of separate sets of aggravating and mitigating circumstances, the statute features an eleven-factor test which focuses the jury's attention on the specifics of the crime and the background and character of the defendant. *Tuilaepa v. California*, 512 U.S. 967 (1994); Cal. Penal Code § 190.3. The first ten factors instruct the jury to evaluate various circumstances of the crime and the defendant's age and prior convictions. *See* Cal. Penal Code § 190.3. The jury itself decides whether these factors are

aggravating or mitigating. *People v. Benson*, 52 Cal. 3d 754, 802 (1990). The eleventh factor — factor (k) — is intended to function as a catch-all that will enable the jury to consider any relevant mitigating circumstance that the defendant proffers as a basis for a sentence less than death. The jury is obligated to weigh and balance the aggravating and mitigating circumstances and must impose the death penalty if it determines that the circumstances in aggravation outweigh those in mitigation. *See* Cal. Penal Code § 190.3.

**[12]** In this statutory scheme, the importance of factor (k) cannot be overstated. The Eighth Amendment requires that a capital jury consider all relevant mitigating evidence offered by the defendant and afford it such weight as it deems appropriate. *Penry v. Johnson*, 532 U.S. 782, 797 (2001); *see also Eddings v. Oklahoma*, 455 U.S. 104, 114-15 (1984) ("The sentencer . . . may determine the weight to be given relevant mitigating evidence. But [it] may not give it no weight by excluding such evidence from [its] consideration."); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (holding that the Eighth Amendment requires that the sentencer consider "*as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death") (emphasis in original). This broad mandate includes the duty to consider mitigating evidence that relates to a defendant's probable future behavior, especially the likelihood that he would not pose a future danger if spared but incarcerated. *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986). Factor (k) provides the only mechanism for allowing the jury to consider a substantial portion of many defendants' mitigating evidence— indeed, all mitigating evidence that does not relate to the circumstances of the crime or the defendant's age and criminal record.

**[13]** To pass constitutional muster, the trial judge's instructions must convey to the jury that factor (k) compels it to consider all relevant mitigating evidence proffered by the

defendant as a basis for a sentence less than death. "[I]t is not enough simply to allow the defendant to present mitigating evidence to the sentencer." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989). Rather, the trial judge's instructions must convey "that the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence." *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998), citing *Penry*, 492 U.S. at 317-18; *Eddings*, 455 U.S. at 113-14; *Lockett*, 438 U.S. at 604.

**[14]** At the time of Belmontes' trial, factor (k) allowed the jury to consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." The Supreme Court had occasion to review this language in *Boyde v. California*, 494 U.S. 370 (1990). In *Boyde*, the defendant had argued that the jury instruction was unconstitutional because there was a reasonable likelihood that the jury would construe the instruction as forbidding it from considering evidence unrelated *to the crime*—e.g., mitigating evidence relating to the defendant's background and character. However, the Supreme Court held that because of the view "long held by society" that a defendant with a disadvantaged background or emotional or mental problems may be "less culpable than defendants who have no such excuse," the jury was reasonably likely to have understood that the defendant's evidence of "his impoverished and deprived childhood, his inadequacies as a school student, and his strength of character in the face of these obstacles" could have "extenuate[d] the gravity of the crime even though it [wa]s not a legal excuse for the crime." *Id.* at 381-82 & n.5. The Court held that, because the trial judge instructed the jury that it "*shall consider all of the evidence* which has been received during any part of the trial of this case," there was no reasonable likelihood that the jury believed that factor (k) prevented it from considering the background and character evidence introduced by Boyde and its bearing on Boyde's commission of the crime. *Id.* at 383 (emphasis in original).[15] In other

---

[15]The Court also defined "extenuates" to mean "lessens the seriousness of a crime as by giving an excuse." *Id.* at 381.

words, the Supreme Court held that the unadorned factor (k), at least when accompanied by an appropriate clarifying instruction, was constitutional as applied to mitigating evidence relating to the defendant's psychological make-up and history, which practically, if not legally, bore upon his commission of the crime and was offered for the purpose of reducing his culpability for the offense.

The same type of evidence, however, can serve an alternative forward-looking purpose, mitigating in a manner wholly unrelated to a petitioner's culpability for the crime he committed. This alternative purpose has nothing to do with persuading the jury that the defendant is *less culpable* with respect to the crime because of some aspect of his family background, personal history, character, or mental capacity. Rather, as defined by the Supreme Court in *Skipper v. South Carolina*, the jury must "consider[ ] a defendant's past conduct as indicative of his *probable future behavior*" and "draw[ ] favorable inferences" about a defendant's "probable future conduct if sentenced to life in prison." 476 U.S. at 4-5(emphasis added).[16] The Court characterized this kind of mitigation as "an inevitable and not undesirable element of crimi-

---

[16]In attempting to extend *Boyde* to issues of future conduct, the dissent errs by focusing on the temporal nature of the evidence rather than the purpose for which it is introduced. In the instant case, the operative distinction is not between categories of "pre-crime" and "post-crime" evidence in the sense of when the acts that constitute the evidence occurred, but rather between a jury's *use* of background and character evidence to mitigate culpability for the crime, as opposed to the use of the same type of evidence to draw favorable inferences about petitioner's probable future conduct. This latter use of the evidence can, as *Skipper* holds, serve as a wholly separate and independent basis for a sentence less than death. Thus, the central question is not whether the jury "was able to consider and give effect to *all* of Belmontes' mitigating evidence," *post* at 8355 (emphasis added), but rather *what mitigating effect* the jury understood to be permissible under the instruction as stated. *Skipper* requires that the jury understand that evidence must be given mitigating effect whether it bears on petitioner's culpability for the crime *or instead* relates to petitioner's future potential for constructive conduct.

nal sentencing" and stated that, even though these kinds of inferences "would not relate specifically to petitioner's culpability for the crime he committed, *there is no question but that such inferences would be mitigating* in the sense that they might serve as a basis for a sentence less than death." *Id.* at 4-5 (emphasis added) (citations and internal quotation marks omitted). Accordingly, the Court held that "[u]nder *Eddings*, such evidence may not be excluded from the sentencer's consideration." *Id.* at 5. The Court's opinion in *Boyde* did not address whether a reasonable jury would have interpreted the unadorned factor (k) instruction to include the use of this same type of evidence for a forward-looking purpose which serves to mitigate without ameliorating the crime. *Boyde*, 494 U.S. at 382 n.5 (distinguishing *Boyde* from *Skipper* on the ground that Boyde's mitigation evidence "was introduced not to demonstrate that he was a 'model prisoner' like Skipper and therefore unlikely to present a risk of future dangerousness but . . . as part of petitioner's overall strategy to portray himself as less culpable than other defendants due to his disadvantaged background and his character strengths in the face of those difficulties.").

Belmontes contends that his Eighth and Fourteenth Amendment rights were violated because the trial judge's instructions failed to advise the jury to consider the portion of his mitigating evidence that tended to show that he would adapt well to prison and would become a constructive member of society if granted a life sentence. We review this claim of instructional error under the approach set forth by the Supreme Court in *Boyde*, which directs us to determine whether there is a reasonable likelihood that the jury understood the instruction in a manner that resulted in its failure to consider constitutionally relevant evidence. 494 U.S. at 380. Although Belmontes' briefs emphasize the trial judge's mid-deliberation colloquy with Juror Hern,[17] the Court has held

---

[17]We reject the government's argument that the mid-deliberation exchange does not count as a jury instruction because it was "rather infor-

that we must examine claims of instructional error in light of the record as a whole. *Id.* at 377. Accordingly, in assessing Belmontes' claim of instructional error, we consider the entire mid-deliberation colloquy as well as the original jury instructions.

**[15]** We begin with the original instructions. As stated above, Belmontes' jury was instructed to consider and take into account "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." Cal. Penal Code § 190.3.[18] Most naturally read, this instruction allows the jury to consider evidence that bears upon the commission of the crime by the defendant and excuses or mitigates his culpability for the offense. We now know that such evidence includes background and character, both of which tend to explain why the defendant committed the crime. By its plain language, however, the instruction does not encompass events or considerations that are unrelated to the defendant's culpability. In particular, the instruction does not apply to those forward-looking considerations encom-

---

mal" and occurred after the formal charge. *See Shafer v. South Carolina*, 121 S. Ct. 1263, 1274 (2001) (labeling the trial judge's answer to the jury's mid-deliberation question an "instruction" and criticizing it because it "did nothing to ensure that the jury was not misled"); *Bollenbach v. United States*, 326 U.S. 607 (1946) (reversing and remanding because a "supplemental instruction" from the trial court following a question by the jury was "simply wrong"); *McDowell v. Calderon*, 130 F.3d 833, 836 (9th Cir. 1997) (en banc), *overruled in part on other grounds*, *Weeks v. Angelone*, 528 U.S. 225 (2000) (explaining that the trial judge's duty to instruct the jury adequately "continues until a verdict is reached and returned. As they work towards a verdict, the jurors must stay in the channel charted for them by state law. To this end, they may need ongoing guidance.").

[18]The California legislature has since reformulated the instruction to direct the jury to consider "any sympathetic or other aspect of the defendant's character or record [that the defendant offers] as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." CALJIC 8.85(k) (6th ed. 1996). *See also People v. Easley*, 34 Cal. 3d 858 (1983) (recognizing that unadorned factor (k) had significant potential for jury confusion.).

passed by the Supreme Court's decision in *Skipper*: evidence that allows the jury to evaluate the defendant's probable future conduct if incarcerated for life without the possibility of parole—specifically, evidence that would tend to prove that Belmontes would likely live a constructive life if permanently confined within a structured prison environment. These important sentencing considerations are simply not in any respect "circumstance[s] that extenuate[ ] the gravity of the crime." *See Skipper*, 476 U.S. at 4 (stating that lack of future dangerousness does "not relate specifically to petitioner's culpability for the crime he committed"); *see also Boyde*, 494 U.S. at 382 n.5. Moreover, unlike in *Boyde*, "society" has not had a "long held view" that a defendant's likely future conduct can serve to mitigate or excuse his commission of a serious crime. Rather, the doctrine is a legal concept peculiar to capital punishment cases. Thus, in the absence of a clear instruction on point, jurors are not likely to be aware in determining the appropriate punishment in such cases that the defendant's potential for a positive adjustment to life in prison constitutes a proper mitigating factor.

**[16]** In the current case, the most important part of Belmontes' mitigation presentation was that the jury should spare his life because he had the potential, if confined within a prison setting, to contribute positively to prison life. Although the record made before the jury included a substantial amount of evidence about his difficult childhood, in his own testimony he repeatedly stated that he did not want to use his rough childhood "as a crutch" or an excuse. Thus, ultimately the more significant evidence related to his conduct during the period of his prior CYA incarceration and to his ability to conform his behavior to societal norms should he be confined within a structured prison environment. Belmontes' counsel argued to the jury that the evidence demonstrated that if granted life without parole, he would adapt well to prison life, would make a positive contribution to the welfare of others, and would not pose a future danger to the guards or the other inmates.

**[17]** Unlike the background and character evidence in *Boyde* that tended to mitigate the offense, Belmontes' mitigation evidence was simply not covered by any natural reading of the words of the unadorned factor (k) instruction. To the contrary, that instruction, read most naturally, suggested to the reasonable juror that Belmontes' evidence tending to show his probable future good conduct should be excluded from consideration, and thus that such evidence was governed by the earlier instruction that the jury "consider all of the evidence . . . except as you may be hereafter instructed." At the least, the unadorned factor (k) instruction is ambiguous with respect to *Skipper*'s requirement that the jury be permitted to consider and give effect to evidence bearing on a defendant's probable future good conduct when it decides whether to impose the death penalty, *see* 476 U.S. at 5, and thus with respect to the jury's right to consider Belmontes' most important mitigating evidence.

**[18]** The court's supplemental instructions only exacerbated this problem. Belmontes' counsel had requested instructions that would have expressly instructed the jury that it "should not limit [its] consideration of mitigating circumstances to these specific factors," i.e., the factors listed in the original instruction. However, although the trial judge gave part of the instruction requested by defense counsel, he refused to give the most critical portion. Instead, the trial judge gave a set of contradictory instructions that failed to inform the jury that it could consider the portion of Belmontes' mitigating evidence bearing on his probable future conduct. The trial judge started out on the right track by instructing the jury that it should view the statutory factors "merely as examples of some of the factors" that it could consider. However, any clarity gained at the outset of the instruction was immediately undone by a superceding qualifying directive. The judge added, "You should pay careful attention to each of these factors," an instruction that a reasonable juror would almost certainly have understood to refer to the statutory factors, and particularly to the unconstitutionally limiting

unadorned factor (k). The trial judge then continued, "Any one of them [i.e., the factors] standing alone may support a decision that death is not the appropriate punishment in this case," implying that only a statutory factor can support a sentence less than death. A juror who followed these instructions would likely think that he could not consider nonstatutory mitigating evidence—evidence not going to culpability—such as testimony tending to show that Belmontes would lead a constructive life if confined permanently within a structured environment. Still, the supplementary instructions did not end the matter.

[19] Compounding the problems with the original and supplemental instructions were the trial judge's responses to the jurors' questions during the mid-deliberation colloquy. In that colloquy, the trial judge again directed the jury's attention to the literal text of the original unadorned factor (k) instruction, which strongly implied that the jury could not consider evidence regarding the defendant's probable future conduct. The jury had deliberated for several hours before it sent the judge a note indicating that it was deadlocked. The note read, "What happens if we cannot reach a verdict?" and "Can the majority rule on life imprisonment?" In the discussion that followed, the judge properly ascertained that further deliberations would probably be fruitful. He then suggested to the jury that it might be helpful to "go over the instructions again with one another" as they continued to deliberate. It was at this point that the jurors began to question the judge with respect to the aggravating and mitigating factors. Juror Hern asked, "The statement about the aggravation and mitigation of the circumstances, now, that was the listing?" When the court responded affirmatively, she asked, "Of those certain factors we were to decide one or the other and then balance the sheet?"

Juror Hern's questions reveal that she did not understand that her duty as a juror was to consider all of Belmontes' mitigating evidence. The most reasonable way to interpret her first question is as an effort to clarify that the jury should look

to the statutory factors (a) through (g) [or unadorned (k)], as read to the jury by the trial judge, to determine what counted as aggravating and mitigating circumstances. It appears that by asking, "that was the listing?," Juror Hern wanted confirmation that there was a finite list of factors for the jury to consider and that the list consisted of the statutory factors read to the jury by the judge. This interpretation is reinforced by Juror Hern's next question: "Of those certain factors, we were to decide one or the other [e.g., whether the evidence is aggravating or mitigating] and then balance the sheet?" The structure of this question separates the "certain factors" that appear in "the listing" from other factors that may not be reflected there. It makes it clear that at least one juror believed that the jury should consider, weigh, and balance only "those certain factors" that appeared in "the listing." Of course, such a belief would have been incorrect; the jury was required to consider and evaluate Belmontes' mitigating evidence relating to his potential adjustment to life in prison regardless of the fact that it was not listed in the statute.

In any event, Juror Hern's questions signified that she was not sure how to follow the judge's instructions.[19] "When a

_____

[19]The Supreme Court has frequently accepted jury questions as evidence that the trial judge's original instructions were not sufficiently clear. *See, e.g., Shafer*, 121 S. Ct. at 1273 ("Shafer's jury left no doubt about its failure to gain from defense counsel's closing argument or the judge's instructions any clear understanding of what a life sentence means."); *Simmons v. South Carolina*, 512 U.S. 154, 178 (1994) ("[T]hat the jury in this case felt compelled to ask whether parole was available shows that the jurors did not know whether or not a life-sentenced defendant will be released from prison."); *Bollenbach*, 326 U.S. at 612 ("The jury's questions . . . clearly indicated that the jurors were confused."). We have done so as well. *E.g., Morris v. Woodford*, 273 F.3d 826, 840 (9th Cir. 2001) (citing fact that jury asked mid-deliberation question as evidence that it was confused by the original instruction); *United States v. Frega*, 179 F.3d 793 (9th Cir. 1999) (stating that a reviewing court may infer from the jury's questions that it was confused about a controlling legal principle). Here, as in those cases, Juror Hern's questions strengthen our conviction that the original and supplemental instructions did not convey to the jury

jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy." *Bollenbach v. United States*, 326 U.S. 607, 612-13, (1946). In this case, the trial judge had a duty to cure any ambiguity in his instructions by providing a clear description of the jury's obligations. The judge should have answered Juror Hern's questions by instructing the jury that "the listing" of mitigating factors was not exhaustive and that the jury's duty was to consider and weigh all of the mitigating evidence presented by Belmontes during the sentencing phase. *Cf. Boyde*, 494 U.S. at 383. Instead, however, the judge simply affirmed Juror Hern's incorrect assumptions with a terse, "That is right." In so doing, he not only failed to correct Juror Hern's erroneous view, but he likely left all the jurors with the impression that they could consider mitigation evidence only if it appeared as one of the "certain factors" in "the listing." As we have discussed, Belmontes' principal mitigating evidence does not fall in this category.

The trial judge also instructed the jury that it could not consider a specific subject relating to Belmontes' ability to adjust to prison life. Less than thirty seconds after Juror Hern's inquiry, Juror Hailstone said: "Could I ask a question? I don't know if it is permissible. Is it possible that he could have psy-

─────────────────────────

that it could consider Belmontes' nonstatutory mitigating evidence pertaining to his probable future behavior in prison if incarcerated for life.

We need not rely on affirmative evidence of jury confusion in order to reach this conclusion, however. *See Kelly v. South Carolina*, 122 S. Ct. 726, 733 (2002) ("Time after time appellate courts have found jury instructions to be insufficiently clear without any record that the jury manifested its confusion."). "A trial judge's duty is to give instructions sufficient to explain the law, an obligation that exists independently of any question from the jurors or any indication of perplexity on their part." *Id.* To hold otherwise would condition our ability to redress serious constitutional violations on such subjective vagaries of fate as whether the jurors happened to ask a question instead of embarking boldly down the wrong path.

chiatric treatment during this time?" The trial judge responded: "That is something you cannot consider in making your decision." He did not explain why the jury could not consider this issue, and immediately after issuing this response, he sent the jury off to resume its deliberations. The instruction not to consider possible future psychiatric treatment was misleading because of the judge's failure to explain to the jury why it could not consider the prohibited subject; to the extent that the jury believed that it could not consider mitigating evidence relating to how Belmontes might behave in a controlled prison environment, the instruction as given would likely have confirmed its misconception.

[20] Juror Hailstone's question and the trial judge's response are troubling because of the likelihood that the jury understood them in the context of the larger discussion about how to consider, weigh, and balance aggravating and mitigating circumstances.[20] In such case, the jury would have inferred from the trial judge's response that it could not consider Juror Hailstone's question, not because there had been no evidence presented on the subject at trial, but because it raised a consideration that did not relate to one of the "certain factors" set forth in "the listing," or, to put it differently, to one of the factors bearing on the defendant's culpability for the crime. The trial judge's response thus likely reinforced the jury's mistaken notion that Belmontes' mitigation evidence

---

[20]The government insists that the reason for his answer was obvious: There was no evidence presented on the topic of possible psychiatric treatment at Belmontes' trial; therefore, the jury could not consider it. The government argues that the jurors would have realized that this was why they could not consider Juror Hailstone's question, and so the trial judge's response could have had no effect on their deliberations. We reject this contention. The jurors at Belmontes' trial were not lawyers; they were not schooled in the rules of evidence, and they had no reason to know that the trial judge's response was based on an evidentiary concern (if, in fact, it was based on an evidentiary concern rather than on the trial judge's misunderstanding of the law). It is far more likely that the jury would have viewed this question and its answer in the manner that we have described.

relating to his probable future good conduct if confined in a structured prison environment was irrelevant to the sentencing decision.

The next question is whether the trial judge's various instructions relating to limitations on the evidence that could be considered had an effect on the jury's deliberations. We may not reverse the jury's penalty determination unless the instructions actually created "a *reasonable probability* that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde*, 494 U.S. at 380 (emphasis added). The jury's decision must stand "if there is *only a possibility* of such an inhibition." *Id.* (emphasis added).

**[21]** We hold that there is a reasonable probability that, as a result of the court's instructions, the jury in Belmontes' case did not consider his principal mitigating evidence. The trial judge began by giving a faulty instruction, one that on its face arguably does not allow consideration of mitigating evidence pertaining to the defendant's probable future good behavior in prison, as opposed to his culpability for the crime. He then rejected a significant part of the supplemental instruction that Belmontes proposed in an effort to solve the problem. The jurors were understandably confused, and they asked questions of the court in an effort to clarify the scope of their duty. In the course of that dialogue, the trial judge endorsed Juror Hern's view of the instructions, a view that strongly suggested that the jury could consider, weigh, and balance only "those certain factors" that appeared in "the listing." Following that endorsement, the trial judge advised the jury without further explanation that, in making its decision, it could not consider the possibility that Belmontes could receive psychiatric treatment in prison. In sum, every instruction that the jury received tended to convey the message that the jury could not consider Belmontes' mitigating evidence unless it related to his culpability for the crime. Under these circumstances, there is, at the least, a reasonable probability that the jury did not consider

Belmontes' principal mitigation evidence—the evidence that provided the factual support for his argument in mitigation: that he would live a productive life if permanently incarcerated in a structured environment. Because "[t]he Eighth Amendment requires that the jury be able to consider and give effect to all relevant mitigating evidence offered by petitioner," *Boyde*, 494 U.S. at 377-78, the unadorned factor (k) instruction, as applied in Belmontes' case, was unconstitutional.

Having concluded that an error of constitutional magnitude infected the penalty phase of Belmontes' trial, we turn finally to the question whether that error was nonetheless harmless. *See Boyde*, 494 U.S. at 380 (applying *Brecht* harmless error standard). Belmontes cannot obtain a new trial unless the instructional error had "a substantial and injurious effect" on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. at 637. We hold that it did.

Our cases appear to be divided as to whether the petitioner, the state, or neither bears the responsibility for showing harmless error under the *Brecht* harmless error standard. *Compare Rodriguez v. Marshall*, 125 F.3d 739, 744 (9th Cir. 1997) (placing burden on petitioner), *with Keating v. Hood*, 191 F.3d 1053, 1062 (9th Cir. 1999) (as amended) (placing burden on state), *and Thompson v. Borg*, 74 F.3d 1571, 1575 (9th Cir. 1996) (rejecting burdens of proof in favor of an independent determination of whether a trial error had a substantial and injurious effect). In a recent case, we stated that "[t]he Supreme Court has made clear that whether a trial error had a substantial and injurious effect is not to be analyzed in terms of burdens of proof." *Mancuso v. Olivarez*, 282 F.3d 728, 737 n.4 (9th Cir.), *as amended*, 292 F.3d 939 (2002), citing *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). In that case, we further stated that the reviewing court has "the responsibility to determine this legal question 'without benefit of such aids as presumptions or allocated burdens of proof that expedite factfinding at the trial.' " *Id.* (quoting *O'Neal*, 513 U.S.

at 437). However, *O'Neal* also stated that "it is the State that bears the "risk of doubt." *O'Neal*, 513 at 438; *Valerio v. Crawford*, 306 F.3d 742, 746 (9th Cir. 2002)(en banc), *cert. denied*, 123 S. Ct. 1788 (2003). Also, as we said only recently, we look to the State to instill in us a "fair assurance" that there was no effect on the verdict. *See Morales v. Woodford*, 336 F.3d 1136, 1148 (9th Cir. 2003) ("[T]he state must provide us with a 'fair assurance' that the error was harmless under Brecht."); *Valerio*, 306 F.3d at 762; *see also O'Neal*, 513 U.S. at 443 ("[T]he State normally bears responsibility for the error that infected the initial trial."). *Valerio* and *Morales* stand for the proposition that only if the State has persuaded us that there was no substantial or injurious effect on the verdict do we find the error harmless. Certainly, "if one is left in grave doubt [about the harmfulness of the error], the conviction cannot stand." *Mancuso*, 282 F.3d at 737 n.4 (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946).

**[22]** Here we need not consider the issue of burdens of proof any further. Regardless of the applicable rule, we are convinced that the instructional error in this case, which prevented the jury from considering and giving effect to Belmontes' most important mitigation evidence, had a substantial and injurious effect on the jury's verdict. At the penalty phase of this trial the aggravating evidence was not strong. It basically consisted of the fact that Belmontes was previously incarcerated in the youth facility for being an accessory after the fact to voluntary manslaughter, one domestic violence incident, and two occurrences relating to possession, or possible possession, of a gun. The prosecutor candidly told the jury that there was not a lot in the way of aggravating evidence. He asked the jury to return a death sentence because of the circumstances of the crime itself. Yet the crime, though shocking and deplorable, was in essence a robbery gone wrong. The murder was not pre-planned, nor did it involve kidnapping, rape, torture, multiple victims, or any of the other especially heinous elements that usually are present when a

jury votes for the ultimate penalty. In short, the McConnell murder was of the kind that generally does not result in a death penalty.[21]

Under these circumstances, there is a reasonable probability that a properly instructed jury would have spared Belmontes' life had it believed that he would not pose a future danger if sentenced to life without parole, and that instead he would become a model prisoner who could contribute something of value to society. The state concedes that Belmontes presented "substantial" evidence in support of this mitigation theme. Several witnesses, including Belmontes himself, testified that although he had difficult in acting appropriately in the outside world, he thrived in the structured, institutional environment of prison. Belmontes described his experience on the CYA's fire crew, during which he rose from last man to number two, a position of leadership and responsibility, and about his gradually increasing involvement in Christianity during his prior incarceration. Reverend Barrett spoke about Belmontes' participation in the M-2 Christian sponsorship program, which he felt was genuine, and testified that in his opinion if granted a life sentence Belmontes would make positive contributions to prison life through his involvement with the prison ministries. One of Belmontes' most important witnesses was Reverend Miller, who testified that Belmontes had been good at counseling young inmates not to repeat the mistakes that he had made and that he "definitely would be used in the prison system for this kind of activity" if granted life without parole.

[23] The importance of this mitigation theme was stressed during closing arguments. In his allocution, Belmontes took responsibility for his actions and stated that he did not want

---

[21]On this point, Belmontes submitted evidence that, of the thirty defendants who were tried for felony-murder in San Joaquin County between 1977 and 1986, only two, including Belmontes himself, received a death sentence. Many defendants whose crimes by any measure were substantially more aggravated than Belmontes' did not receive a death penalty.

to use his difficult childhood as an excuse. He asked the jury to give him the opportunity to rehabilitate himself, set goals, and make a positive contribution to the welfare of others while in prison. His counsel repeated this theme in his emotional closing argument, in which he asked the jury to spare Belmontes' life on the ground that he would make positive contributions if allowed to live out his natural life in prison.

Given the weakness of the aggravating evidence and the substantial nature of the mitigating evidence, we conclude that had the jury been properly instructed, and had it understood that it could consider and give effect to the evidence regarding Belmontes' ability to function effectively in a prison setting, there is a reasonable probability that it would have returned a different verdict. Accordingly, Belmontes is entitled to relief on the sentencing phase.

## CONCLUSION

Although we are disturbed by the prosecution's failure to disclose impeaching evidence and to correct false testimony on the part of its principal witness, as well as by defense counsel's failure to disclose the extent of his prior representation of Vasquez and to pursue a full investigation of Vasquez's background, and although we are at least as disturbed by the results of the study that showed the discriminatory racial effect of the County's capital charging policies, we cannot conclude, for the reasons we have explained, that any of these occurrences served to violate Belmontes' constitutional rights. Thus, we are compelled to deny relief with respect to the guilt phase, including the special circumstances finding. However, because the trial judge failed to instruct the jury that it was required to consider Belmontes' principal mitigation evidence, and because we conclude that this failure had a substantial and injurious effect upon the verdict, we reverse with respect to the sentencing phase. We remand to the district court with instructions to issue an appropriate writ vacating Belmontes' death sentence.

AFFIRMED in part, REVERSED in part, and REMANDED for issuance of the writ in accordance with this opinion.

---

O'SCANNLAIN, Circuit Judge, concurring in part and dissenting in part:

The court properly affirms Judge Levi's determination that there was no constitutional error in Belmontes's conviction for first-degree murder with special circumstances in state court. I am pleased to concur in its conclusions as to the guilt phase. Regrettably, as to the penalty phase, the majority strains mightily—and unpersuasively—to perceive constitutional error in the comprehensive and perfectly proper jury instructions given by the state trial judge. Because there simply is no such error, and the Supreme Court has expressly told us so on two separate occasions, I must respectfully dissent from the court's reversal of the district court's denial of the petition for the writ with respect to the penalty phase.

Over a decade ago, the Supreme Court in *Boyde v. California*, 494 U.S. 370 (1990), interpreted the same jury instruction at issue today, "factor (k)," and concluded that it was constitutionally sound. The Court held that there was no "reasonable likelihood that the jury . . . applied [factor (k)] in a way that prevent[ed] the consideration of constitutionally relevant evidence." *Id.* at 380. Factor (k)'s constitutionality was recently reaffirmed in *Brown v. Payton*, 544 U.S. ___, 125 S. Ct. 1432, 1442 (2005), where the Court again refused to invalidate a death sentence imposed pursuant to instructions that included factor (k). The Court reached that result even though the prosecutor had explicitly argued to the sentencing jury that factor (k) prohibited them from considering the defendant's mitigating evidence. *Id.* at 1440.

The majority nonetheless manages to distinguish *Boyde* and *Payton*, and reaches the extraordinary conclusion that there

was a reasonable likelihood that the jury refused to consider mitigating evidence that *both* the prosecution and the defense acknowledged was properly before it. Because the jurors were not constitutionally barred from making a death penalty determination in this case, I would affirm.

I

At the close of the penalty phase, the state trial court judge began instructing the jury on aggravating and mitigating circumstances as follows: "In determining which penalty is to be imposed on the defendant you shall consider all of the evidence which has been received during any part of the trial of this case, except as you may be hereafter instructed." The court then read an enumerated list of seven factors, exhaustive with respect to aggravating circumstances, but only examples with respect to mitigating circumstances. The last of these factors, factor (k), instructs the jury to consider, "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." The majority, by misconstruing both Supreme Court precedent and the evidence in this case, concludes that the factor (k) instruction failed to provide an outlet for the jury to consider some of Belmontes's penalty phase evidence.

A

The majority's holding is based on the false premise that factor (k) limits the jury's consideration only to circumstances that might excuse the crime. *See supra*, at 8341-42. But the Supreme Court has already explicitly rejected this proposition. In *Boyde*, the Court held that factor (k) did not "limit the jury's consideration to 'any other circumstances *of the crime* which extenuates the gravity of the crime.' [It directed the jury] to consider *any other circumstance* that might excuse the crime, which certainly includes a defendant's background and character." 494 U.S. at 382 (emphases in original); *see also id.* at 381 (holding that there was "no[ ] . . . reasonable

likelihood that Boyde's jurors interpreted the trial court's instructions to prevent consideration of mitigating evidence of background and character"). *Boyde* makes it perfectly clear that testimony relating to a defendant's pre-crime background and character is within the jury's purview under factor (k).

Belmontes's penalty phase presentation was entirely composed of such evidence. The witnesses who testified on his behalf spoke to his religious convictions and his behavior while a ward of the California Youth Authority ("CYA")—all of which goes to his background and character *before* he murdered Steacy. While the majority attempts to paint such evidence as showing that he would be a model inmate if sentenced to life in prison, the testimony as actually presented deals exclusively with his character prior to the crime. In fact, not one witness who testified during the penalty phase testified to Belmontes's behavior after the murder.

Belmontes's religious conversion and ability to conform to prison are exactly the types of evidence that the Supreme Court held fit within the plain language of factor (k). *See Boyde*, 494 U.S. at 382 (holding that Boyde's strength of character in the face of adversity was considered evidence that "excused" the gravity of the crime under factor (k)). Accordingly, under *Boyde*, the jury was able to consider and to give effect to *all* of Belmontes's mitigating evidence. Nothing more was constitutionally required. *Johnson v. Texas*, 509 U.S. 350, 372 (1993) (holding that "a jury [need not] be able to give effect to mitigating evidence in every conceivable manner in which the evidence might be relevant").

Even so, the Supreme Court has held that inquiry into *future* dangerousness of a defendant "is not independent of an assessment of personal culpability." *Id.* at 369. In *Johnson*, the Court held that an instruction that asked jurors to consider the future dangerousness of a defendant provided ample opportunity for the jury to consider the defendant's youth as mitigating evidence. *Id.* at 369-70. Even though the statutory

factor did not explicitly provide that the jury could consider the defendant's youth as a mitigating factor for culpability of the crime, the Court concluded that there was no reasonable likelihood that the jury would have thought it was foreclosed from considering it. *Id.* at 370.

Likewise, because factor (k) allows the jury to consider Belmontes's character and background, there is no reason to think that the jury would have thought it was foreclosed from using such information to consider his future potential if sentenced to life in prison. As the Supreme Court has noted, "Consideration of a defendant's past conduct as indicative of his probable future behavior is an *inevitable* and not undesirable element of criminal sentencing." *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986) (emphasis added); *see also Boyde*, 494 U.S. at 382 ("Petitioner had an opportunity through factor (k) to argue that his background and character 'extenuated' or 'excused' the seriousness of the crime, and we see no reason to believe that reasonable jurors would resist the view, 'long held by society,' that in an appropriate case such evidence would counsel imposition of a sentence less than death."); *cf. Johnson*, 509 U.S. at 370.

Thus, while the majority scours the cold record decades after the trial to find an ambiguity in the sentencing instruction, it is highly doubtful that the jury itself would have so found. "Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might." *Boyde*, 494 U.S. at 380-81. I see no reason why the jury would have resisted the inevitable consideration of Belmontes's future potential in light of the character evidence presented.

### B

The majority also ignores the Supreme Court's advice that "[d]ifferences . . . in interpretation of instructions may be thrashed out in the deliberative process, with commonsense

understanding of the instructions in light of all that has taken place at the trial likely to prevail over technical hairsplitting." *Boyde*, 494 U.S. at 381. That factor (k) permits the consideration of Belmontes's character evidence is amplified when the penalty phase is viewed as a whole, particularly in light of the arguments made by counsel. *See Payton*, 125 S. Ct. at 1440 ("*Boyde* . . . mandates that the whole context of the trial be considered.").

In *Payton*, the prosecutor explicitly argued during the penalty phase that factor (k) did not permit the jury to consider evidence of the defendant's post-crime religious conversion. *Id.* Notwithstanding the trial judge's failure to correct this misstatement of law, the Supreme Court concluded that habeas relief was not warranted because it was improbable that the sentencing jury would have disregarded the two days of mitigating evidence presented by the defense. *Id.* In contrast, during the penalty phase of Belmontes's trial, *both* the prosecutor and the defense attorney urged the jury to consider the mitigating evidence, and the trial court likewise instructed the jury to consider all the evidence unless directed otherwise. *See Boyde*, 494 U.S. at 383 (relying in part on the fact that Boyde's jury was instructed that it "*shall consider all of the evidence which has been received during any part of the case*" (emphasis in original)). The majority nevertheless concludes that the jury likely misunderstood its sentencing task after repeatedly receiving the same unambiguous directions from the prosecutor, the defense attorney, and the court.

The jury heard, without objection, evidence regarding Belmontes's behavior in prison before the murder: how he had found God and how he could serve as an example to other inmates. In its closing argument, the prosecution stated, "I suspect you will be told . . . that the defendant's religious experience is within that catchall [factor (k)] that relates to the defendant at the time he committed the crime, extenuates the gravity of the crime. I'm not really sure it fits in there. I'm not sure it really fits in any of them." Even so, the prosecutor

noted, "But I think it [Belmontes's religious experience] appears to be a proper subject of consideration."

Later the prosecutor expounded on why the jury *should* consider Belmontes's evidence:

> I suppose you can say it would be appropriate [to consider such evidence] because—in this fashion: The defendant may be of value to the community later. You recall the people talking about how he would have the opportunity to work with other prisoners in prison. And I think that value to the community is something that you have to weigh in. There's something to that.[1]

Belmontes's pleas were similar. Belmontes asked for life in prison because in prison "there is an opportunity to achieve goals and try to better yourself." His counsel continued the argument, asking the jury to spare Belmontes's life because he would make a positive contribution if his life were spared: "[W]hat I am suggesting to you and what I hope the evidence

---

[1] The prosecutor's admonition to the jury that it must consider Belmontes's mitigating evidence contrasts sharply with the statements of the *Payton* prosecutor, who forcefully argued that factor (k) required the jury to disregard all of the defendant's mitigating evidence:

> "[Factor] K" says any other circumstance which extenuates or lessens the gravity of the crime. What does that mean? That to me means some fact— okay?—some factors at the time of the offense that somehow operates to reduce the gravity for what the defendant did. It doesn't refer to anything after the fact or later. That's particularly important here because the only defense evidence you have heard has been about this new born Christianity.
>
> . . . .
>
> What I am getting at, you have not heard during the past few days any legal evidence mitigation. What you've heard is just some jailhouse evidence to win your sympathy, and that's all. You have not heard any evidence of mitigation in this trial.

*Payton*, 125 S. Ct. at 1446 (Souter, J., dissenting).

suggests to you is Fernando Belmontes cannot make it on the outside. I think it is pretty clear from the development he undertook, the kind of experiences he had with the Haros as compared with his being placed out on his own." He added:

> The people who came in here told you about him. They told you not only what they know of him, but they gave you, as best they could, under the very difficult circumstances of somebody looking at the rest of their life in prison, a game plan, something he can do with his life, something he's been able to do. We're just suggesting the tip of the iceberg because who knows in 20, 30, 40, 50 years what sorts of things he can do, as he fits into the system, as he learns to set his goals, to contribute something in whatever way he can.

At no time did the prosecutor object to the defense's characterization, nor did the trial judge indicate that the parties' statements of law were not correct or that the jury could not consider any of the evidence. Nevertheless, the majority concludes that the jury thought that the witnesses wasted their time by testifying, and that the prosecutor, Belmontes, and Belmontes's lawyer were not smart enough to realize they were all mistaken. *See Payton*, 125 S. Ct. at 1440 ("for the jury to have believed it could not consider Payton's mitigating evidence, it would have had to believe that the penalty phase served virtually no purpose at all"). In its world, the majority envisions a jury playing a game of "gotcha" with the lawyers, whereby the jury ignores everyone and applies its own instructions. Such a conclusion is pure fantasy and cannot justify overturning the jury's choice here. *See Buchanan v. Angelone*, 522 U.S. 269, 278-79 (1998) ("The parties in effect *agreed* that there was substantial mitigating evidence and that the jury had to weigh that evidence against petitioner's conduct in making a discretionary decision on the appropriate penalty. In this context, there is not a reasonable likelihood that the jurors in petitioner's case understood the challenged

instructions to preclude consideration of relevant mitigating evidence offered by petitioner." (emphasis in original; internal quotation marks omitted)).

## II

Even assuming, arguendo, that there was a reasonable likelihood that the jury could have interpreted factor (k) to prohibit consideration of Belmontes's character witnesses, the instructions were still constitutionally sufficient. To arrive at its result, the majority downplays the trial court's *initial* instruction, in which the jury was told, "In determining which penalty is to be imposed on the defendant you *shall consider all of the evidence which has been received during any part of the trial of this case*, except as you may be hereafter instructed." (emphasis added). Such a jury instruction alone is constitutionally sufficient to convey to the jury its duty to consider all mitigating evidence. *See Buchanan*, 522 U.S. at 277 (holding that there was no likelihood of confusion when the jury had to indicate on the statutory verdict form that it had "considered the evidence in mitigation of the offense" and the trial court provided the following mitigation instruction: "[I]f you believe from all the evidence that the death penalty is not justified, then you shall fix the punishment of the defendant at life imprisonment"); *Johnson*, 509 U.S. at 368 (holding that a jury instruction that stated that the jury could consider all the mitigating evidence presented during both the guilt and penalty stage was sufficient to inform the jury that it could consider evidence of defendant's youth); *Blystone v. Pennsylvania*, 494 U.S. 299, 307-08 (1990) ("In petitioner's case the jury was specifically instructed to consider, as mitigating evidence, any 'matter concerning the character or record of the defendant, or the circumstances of his offense.' This was sufficient to satisfy the dictates of the Eighth Amendment." (citation omitted)); *cf. Tuilaepa v. California*, 512 U.S. 967, 979 (1994) ("A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision.").

The trial court's duty is simply to convey to the jury that all mitigating evidence must be considered and may be given effect when it deliberates on a defendant's capital sentence. *Buchanan*, 522 U.S. at 276. The absence of *any specific instruction* to the jury to consider the defendant's ability to adjust to an institutional setting is utterly irrelevant. *Id.* at 277 ("By directing the jury to base its decision on 'all the evidence,' the instruction afforded jurors an opportunity to consider mitigating evidence.").

Even if the jury were confused by the subsequent enumeration of individual factors—perhaps thinking that its consideration of mitigating evidence was limited to such factors—the confusion would have been short lived. After reading the enumerated factors, the court instructed, "[T]he mitigating circumstances which I have read for your consideration are *given to you merely as examples of some of the factors* that you may take into account as reasons for deciding not to impose a death penalty or a death sentence upon Mr. Belmontes." The majority, however, fixates, not on the clear language of such directive, but on the two sentences that directly follow: "You should pay careful attention to each of these factors. Any one of them standing alone may support a decision that death is not the appropriate punishment in this case." According to the majority, these sentences somehow obfuscate the clarity of the court's instructions.

We must look at these instructions in their entirety, however. *See Boyde*, 494 U.S. at 378 ("we accept at the outset the well-established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge" (internal quotation marks omitted)). The judge instructed:

> I have previously read you a list of aggravating circumstances which the law permits you to consider if you find that any of them is established by the evidence. These are the only aggravating circumstances

that you may consider. You are not allowed to take account of any other facts or circumstances as the basis for deciding that the death penalty would be an appropriate punishment in this case.

However, the mitigating circumstances which I have read for your consideration are given to you merely as examples of some of the factors that you may take into account as reasons for deciding not to impose a death penalty or a death sentence upon Mr. Belmontes. You should pay careful attention to each of these factors. Any one of them standing alone may support a decision that death is not the appropriate punishment in this case.

When these instructions are read in context, there is little doubt that the court conveyed the message that the enumerated factors were not the exclusive mitigating circumstances that the jury could consider. The court first instructed the jury how to apply the aggravating circumstances, specifically that it could not consider any non-enumerated factors. The court then contrasted consideration of aggravating factors with mitigating factors, which it noted were merely "examples of some of the factors" that the jury could consider. The fact that the court further instructed that the jury should consider each of the mitigating factors (recall that "factors" refers to *all* mitigating circumstances and not, as the majority implies, to the enumerated circumstances read by the judge), as any one alone might support life in prison, was unlikely to confuse the jury, when viewed in totality.

The trial court's additional instruction reinforced the constitutional requirement of conveying to the jury that it is "not . . . precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence." *Buchanan*, 522 U.S. at 276. Instead of confusing the jury, the trial court's instructions made it clear that all evidence that was presented must be considered. Moreover, the instruction

that the majority concludes was "critical," *supra*, at 8343, substantively adds nothing. Rather than speculating that the jury was too dim to understand what it was told by the court, we must presume that the jury understood the instructions taken as a whole. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

## III

According to the majority, however, it is the series of questions between individual jurors and the judge that proves the jury's confusion. After the jury deliberated for several hours, it sent the judge a note asking, "What happens if we cannot reach a verdict?" and "Can the majority rule on life imprisonment?" The judge refused to tell the jury what would happen if they could not agree, but told them that it would discharge them if they could not reach an agreement. He then asked, "Do you think if I allow you to continue to discuss the matter and for you to go over the instructions again with one another, that the possibility of making a decision is there?"

At this time, individual jurors asked the judge some questions.

> JUROR HERN: The statement about the aggravation and mitigation of the circumstances, now, that was the listing?

> THE COURT: That was the listing, yes, ma'am.

> JUROR HERN: Of those certain factors we were to decide one or the other and then balance the sheet?

> THE COURT: That is right. It is a balancing process.

> . . . .

> JUROR HAILSTONE: Could I ask a question? I
> don't know if it is permissible. Is it possible that he
> could have psychiatric treatment during this time?
>
> THE COURT: That is something you cannot con-
> sider in making your decision.

In the majority's view, Juror Hern's use of the term "list-ing," and the judge's failure to note that the "listing" was not exclusive as to mitigating circumstances, shows that individ-ual jurors were confused by the instruction. I respectfully dis-agree. The jury did not submit a formal question to the judge to indicate that it was confused as to its duties or the instruc-tions, and no informal follow-up questions were asked by any jurors. And while the answers the judge gave the juror might have been cryptic, they were not incorrect. *Cf. Bollenbach v. United States*, 326 U.S. 607, 613 (1946).

Most importantly, just before the judge answered these informal questions, he asked the jury "to go over the instruc-tions again." Under existing Supreme Court authority, any confusion with regard to its responsibilities would have been cleared up with another such review. *See Weeks*, 528 U.S. at 233-34 (holding that no likelihood of confusion existed when the trial judge referred back to his original instruction when the jury asked a question regarding the instructions them-selves). And if, after reviewing the instructions once again, jurors were still confused about the evidence they could con-sider, they likely would have asked for a formal clarification. *See id.* at 234 (noting that the jury did not submit a follow-up question after the judge referred it back to the original instruc-tions). While it is *possible* that after reviewing the instructions again, confusion might have arisen, it was certainly not *rea-sonably likely*. *See Boyde*, 494 U.S. at 380.

Incredulously, the majority also takes issue with Juror Hail-stone's question regarding whether Belmontes could receive psychiatric treatment while in prison. The court properly

instructed the jury that it could not consider such potentially mitigating evidence. And for good reason: *no such evidence was ever introduced at any stage of the trial*. Indeed, the jury *was prohibited* from such considerations. *See Hughes v. Borg*, 898 F.2d 695, 700 (9th Cir. 1990) ("State defendants have a federal constitutional right to an impartial jury and jurors have a correlative duty to consider only the evidence that is presented in open court."); *see also TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 468 (1993) (Kennedy, J., concurring) ("Unlike a legislature, whose judgments may be predicated on educated guesses and need not necessarily be grounded in facts adduced in a hearing, a jury is bound to consider only the evidence presented to it in arriving at a judgment." (citations omitted)).

There was absolutely nothing wrong with the trial judge's instruction that the jury could not consider evidence that was not presented; indeed, it would have been unconstitutional for him to have said otherwise. Yet, the majority ignores such niceties. If the jury were truly confused by the judge's answer, surely it would have asked a follow-up question of some sort. Nonetheless, without any basis in the record, the majority concludes that the judge's perfectly proper statement was likely to confuse.

## IV

The majority concludes that the jurors listened to all the evidence regarding Belmontes's character, listened to the prosecution and the defense tell it to consider such evidence, and listened to the trial court tell it that it must consider all the evidence presented; yet the majority holds that the jury was confused about whether it could consider the evidence presented. Such conclusion, with all due respect, is simply beyond belief; such holding turns the entire proceeding "into a virtual charade." *Boyde*, 494 U.S. at 383 (internal quotation marks omitted).

The jury, in reality, returned a death sentence for Belmontes, not because of a confusing jury instruction, but because he murdered nineteen-year-old Steacy McConnell in cold blood, striking her 15-20 times in the head with an iron dumbbell he had brought with him to her house in case of such an encounter; I sincerely doubt the family and friends of Steacy would share the majority's callous view that her murder was not "especially heinous."

Not surprisingly, the prosecution was able to portray Belmontes as a violent young man by focusing on his past behavior: his armed theft of a loaded handgun, his tendency to carry such a weapon, his fight with another ward while in the CYA after pleading guilty to being an accessory after the fact to voluntary manslaughter, and his battery of his pregnant girlfriend, which caused her to drop their two-year-old daughter. It is such violent, antisocial behavior, not an ambiguous jury instruction, that placed him in the situation he now finds himself.

Perhaps the jury simply did not believe that a convicted murderer might be a particularly good role model to other inmates, despite Reverend Miller's testimony that Belmontes would be good at counseling other inmates not to repeat his "mistakes." After all, Steacy's murder was hardly a "mistake." Perhaps Belmontes's jailhouse conversion to Christianity, which mysteriously lapsed as soon as he returned to society, and his ascent to the top of CYA's fire crew, could rightly have been seen as manipulative ploys to gain early release for his previous crimes. *Cf. Payton*, 125 S. Ct. at 1442 ("Testimony about a religious conversion spanning one year and nine months may well have been considered altogether insignificant in light of the brutality of the crimes, the prior offenses, and a proclivity for committing violent acts against women.").

By concluding that the trial court's jury instructions were unconstitutional, the majority ignores the "strong policy

against retrials years after the first trial where the claimed error amounts to no more than speculation." *Boyde*, 494 U.S. at 380. There is nothing in the record which would lead me to believe that there was a reasonable probability that the jury was confused about its sentencing duties; therefore I would affirm the denial of the petition for the writ as to the penalty phase. I must respectfully dissent from the majority's refusal to do so.[2]

---

[2]Belmontes also contends that he was deprived of constitutionally effective counsel during the penalty stage of his trial. His claim is without merit. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984); *Gerlaugh v. Stewart*, 129 F.3d 1027, 1035-36 (9th Cir. 1997).